Gary CAPSHAW, Appellant (Defendant),

v.

The STATE of Wyoming,
Appellee (Plaintiff).

No. 98–240.

Supreme Court of Wyoming.

Sept. 29, 2000.

Representing Appellant: Sylvia Lee Hackl, State Public Defender; Donna D. Domonkos, Appellate Counsel; Diane Courselle, Director, Wyoming Defender Aid Program; and Vaughn Neubauer, Student Intern. Argument presented by Mr. Neubauer.

Representing Appellee: Gay Woodhouse, Attorney General; D. Michael Pauling, Senior Assistant Attorney General; and Paul S. Rehurek, Deputy Attorney General. Argument presented by Mr. Rehurek.

Before LEHMAN, C.J., and THOMAS, MACY*, GOLDEN, and HILL, JJ.

HILL, Justice.

Appellant, Gary Capshaw (Capshaw), was convicted by a jury of conspiring to bring large quantities of methamphetamine into Casper, Wyoming, for resale. On appeal he faults the district court for improperly admitting W.R.E. 404(b) evidence, claims a fatal variance between the crime charged and that proven, and charges that admission of his conspirators' guilty pleas to the subject conspiracy prejudiced his defense. We are unable to conclude that the district court abused its discretion in admitting Rule 404(b) evidence, nor can we find that testimony regarding the conspirators' guilty pleas ne-

* Retired June 2, 2000.

cessitates reversal under the plain error doctrine, in light of the strength of the State's case and the appellant's chosen trial strategy. The conspiracy alleged was that for which Capshaw was convicted. Therefore, we affirm.

## ISSUES

Capshaw identifies three issues on appeal:

I. Did the trial court err by allowing unfairly prejudicial other crimes evidence to be introduced at trial, which could permit a reasonable juror improperly to infer that because of an independent incident when methamphetamine was discovered at a motel in Evanston, Gary Capshaw must be guilty of conspiracy to deliver?

II. Did the variance between the single broad-based conspiracy charged in the information, and the more limited conspiracies demonstrated at trial affect Mr. Capshaw's substantial rights and require reversal of his conviction?

III. Did the State's questioning of witnesses about their guilty pleas to offenses which arose out of circumstances leading to Gary Capshaw's trial improperly imply that Gary Capshaw is also guilty and violated his right to have a trial on its own merits?

The State iterates those issues in somewhat different form:

I. The trial court properly admitted evidence of [Capshaw's] possession and transportation of a large quantity of methamphetamine during the [same] time period charged in the conspiracy.

II. There was no variance between the conspiracy charged and the conspiracy proved at trial. In any event, this issue was never raised in the trial court and should not be considered on appeal.

III. Under the circumstances of this case, it was not reversible error for the prosecutor to elicit from a witness that he had pleaded guilty to a charge of conspiring with [Capshaw] to deliver a controlled substance.

## FACTS

In the late 1980's, Capshaw and Steve Tisdale (Tisdale) were fellow inmates at the Wyoming State Penitentiary and the Honor Farm, and the two got to know each other well. Upon his release from confinement in 1989, Tisdale returned to his home in Stockton, California. Early in 1993, Capshaw was looking for a supply of methamphetamine and visited Tisdale in California. Capshaw told Tisdale that there was money to be made by transporting the drug from California, where it was plentiful and relatively cheap, to Casper, where Capshaw "said he could get a lot more for it." Tisdale became the source for several pounds of methamphetamine, which Capshaw and others imported to Casper for delivery at a much higher price.

After his initial purchases from Tisdale, Capshaw began to solicit his friends to invest in his scheme, urging Lynette Draper (Draper) to help him buy methamphetamine in California for resale in Casper at great profit. Another willing recruit was Steven Horn (Horn), whom Capshaw introduced to Tisdale. Horn accompanied Capshaw on several trips to California, participating in his purchases from Tisdale, and eventually handling most of the Casper sales. Later, Capshaw's introduction of Horn to Tisdale paved the way for Horn to make his own purchases of methamphetamine, which he resold in Casper.

On March 22, 1993, Horn and Capshaw picked up a shipment of at least three quarters of a pound of methamphetamine from Tisdale. Capshaw told Draper that he had spent $6,000.00 for methamphetamine on that particular trip. However, ten miles out on the return leg to Casper, the conspirators' vehicle broke down. Tisdale was certain of the date because when he went to rescue Horn and Capshaw, he was arrested by a California highway patrolman for driving under the influence. In addition, the next morning Tisdale's wife rented a car for Horn and Capshaw to use on their return trip, and the dated rental car receipt was admitted into evidence.

The police obtained Tisdale's rental car agreement when a search warrant was exe-

cuted upon the home shared by Michelle McIntosh (McIntosh) and Horn on March 24, 1993. When Capshaw and Horn returned from that late March trip, Draper observed them weighing out sales portions, repackaging those smaller amounts in separately sealed containers, and selling their product to an unidentified "dark haired girl with a child, a little boy or a little girl." The search warrant, which was obtained as a result of Draper's information, yielded two ounces of methamphetamine, $650.00 in cash, the scales employed by the two conspirators, numerous resale containers, and the rental car agreement, *inter alia* [1].

Capshaw made one final bulk purchase of methamphetamine from Tisdale in June of that year, "around Father's Day, 1993." McIntosh drove Capshaw to Salt Lake City, Utah, and the two of them then proceeded to Stockton, California, by train. Tisdale picked them up at the train station and took them to a motel where they stayed the night. The next day, Tisdale and Capshaw sought out a source for their final transaction. Following the couple's return to Wyoming, Capshaw gave an individual dose of methamphetamine to McIntosh as a reward for providing her vehicle and company on the trip.

### DISCUSSION

### Admission of Rule 404(b) Evidence

Prior to the commencement of trial, Capshaw filed a demand for notice of prosecutorial intent to introduce evidence pursuant to W.R.E. 404(b), as well as a motion *in limine* aimed, *inter alia*, at excluding evidence of bad acts, either prior to or after the time frame of the conspiracy alleged. The State then notified Capshaw of its intent to introduce evidence concerning a visit Capshaw made to Evanston, Wyoming, on April 13 and 14, 1993. The State sought to prove that Capshaw and an unidentified third party had shared a motel room on that occasion and, upon vacating the motel room, four baggies, each containing approximately ¼ ounce of methamphetamine, were found by the clean-

ing crew after the two occupants of the room had checked out. Eventually, the district court analyzed that evidence according to the test articulated in *Vigil v. State*, 926 P.2d 351, 357 (Wyo.1996) (hereinafter, the *Vigil* test), finding it admissible. In its case in chief, the State called five witnesses and offered four exhibits to prove that incident. Capshaw renews his challenge to any evidence concerning the motel incident, asserting that such evidence had no demonstrable relevance to the charges against him, that the prejudicial impact of the evidence far outweighed any probative value that it might have had, and, in any event, that dual occupancy of the motel room should have obviated any effort to connect the seized methamphetamine with him.

Admission of evidence at trial lies within the sound discretion of the district court. *Curl v. State*, 898 P.2d 369, 373 (Wyo. 1995). Decisions to admit or exclude evidence will not be overturned on appeal absent a clear abuse of that discretion. *Sturgis v. State*, 932 P.2d 199, 201 (Wyo.1997). The sound exercise of discretion is characterized by the reasonableness of the choice made. *Vaughn v. State*, 962 P.2d 149, 151 (Wyo. 1998). Reasonable choices are those based upon objective criteria made with due regard for what is right under the circumstances and unsullied by arbitrary or capricious conclusions. *Martin v. State*, 720 P.2d 894, 897 (Wyo.1986) (citing *Byerly v. Madsen*, 41 Wash.App. 495, 704 P.2d 1236 (1985)). By contrast: "Abuse of discretion occurs when a court's decision, or decision-making process, exceeds the bounds of measured reason in light of those matters properly before that court." *Curl*, 898 P.2d at 373 (citing *Martinez v. State*, 611 P.2d 831, 838 (Wyo.1980)).

When the issue is admission of evidence of other crimes, wrongs, or acts, we measure the district court's exercise of its discretion according to the specific four-part *Vigil* test, as derived from *United States v. Herndon*, 982 F.2d 1411, 1414–15 (10th Cir.1992), *aff'd on appeal after remand*, 34 F.3d 1077 (10th

---

**1.** The search warrant was invalidated because of a mistaken street address. While that error inured to the temporary benefit of Horn and McIntosh by virtue of their residence in the house, which was searched, Capshaw's challenge to admission of the evidence seized as a result of the warrant failed because he lacked standing to challenge the inaccurate warrant.

Cir.1994), which decision relies, in turn, upon *Huddleston v. United States*, 485 U.S. 681, 692–92, 108 S.Ct. 1496, 1502, 99 L.Ed.2d 771 (1988). *Vigil*, 926 P.2d at 354–57.

At the threshold, the *Vigil* test is noteworthy for the increased vigilance it requires of defense counsel. Under the so-called *Dean* test, which *Vigil* has supplanted, the initial burden was upon the prosecution to demonstrate the admissibility of any other bad act evidence the State wished to proffer. *Dean v. State*, 865 P.2d 601, 609 (Wyo.1993). Now, pursuant to *Vigil*, a prosecutor need not prove the admissibility of other bad acts evidence unless the defense first interposes an objection, absent, of course, plain error. *Vigil*, 926 P.2d at 355. Cautious counsel will generally seek pretrial notice from the prosecution of any bad acts evidence the prosecution proposes to proffer. Such a request for notice removes the decision to raise a W.R.E. 404(b) objection from the realm of trial tactics and allows the defense to challenge admissibility out of earshot of the jury, without need for an objection which jurors might interpret as aimed at keeping information from them.

A timely defense objection to the prosecution's proffer triggers a carefully delineated test:

> Such evidence is admissible if: 1) the evidence is offered for a proper purpose; 2) the evidence is relevant; 3) the probative value of the evidence is not substantially outweighed by its potential for unfair prejudice; and 4) upon request, the trial court instructs the jury that the [other bad] acts evidence is to be considered only for the proper purpose for which it was admitted.

*Vigil*, 926 P.2d at 357.

■ Here, although the prosecutor provided the notice of other bad acts evidence requested by the defense, and the defense filed a pretrial motion *in limine*, the district court did not consider the admissibility of evidence concerning the motel incident until after the jury had been impaneled and the parties had given their opening statements. As a consequence, the prosecutor was able to preview that evidence for the jury before the court made a detailed determination of admissibility. Such premature and untoward disclosure of other bad acts evidence to a jury constitutes a kind of prosecutorial brinkmanship which is contrary to the ordered process envisioned in *Vigil* and is inconsistent with the prosecutor's ethical obligation to further the ends of justice. *Curl*, 898 P.2d at 376; Wyoming Rules of Professional Conduct for Attorneys at Law, 3.8, comment 1.

■ When the belated *Vigil* hearing was finally convened, the prosecutor sought to legitimize evidence regarding the motel incident by noting that it fit within the time frame of the alleged conspiracy, was described in the affidavit supporting the information filed against Capshaw, involved the drug which Capshaw was accused of conspiring to deliver, and placed him on "the only route that's going to get him [from Casper to Stockton and back]." With respect to the dual occupancy of the motel room in which the drugs were found, the prosecutor asserted that he need not conclusively link the drugs to Capshaw but could rely upon the jury to make that inference.

In response, the defense noted that the prosecutor had failed the *Vigil* test at the outset by neglecting to explain what part of the alleged conspiracy the motel incident would be presented to prove or, put another way, the evidentiary purpose of that information. Given the problems engendered by the motel room's double occupancy, counsel observed that any connection of the drugs to Capshaw was speculative at best. Finally, counsel noted that the dubious probative value of the motel incident was overwhelmed by the clear likelihood that it would simply inflame the jury by suggesting that Capshaw had a propensity to engage in crimes involving drugs, rather than serving to prove any necessary element of the charged crime.

In ruling on Capshaw's motion *in limine*, the district court observed that the motel incident was offered for the purpose, *inter alia*, of showing the "course of conduct of the conspiracy." The court went on to make findings as to the remaining three prongs of the *Vigil* test, finding the evidence to be relevant and more probative than prejudicial

and offering to give a limiting instruction if one was offered by Capshaw[2].

The district court appropriately applied the *Vigil* test to the motel incident evidence, and we are unable to conclude that the determination was an abuse of discretion.

### Variance Between Conspiracy Charged and Conspiracy Proven

For his second assignment of error, Capshaw claims that while the State alleged that Tisdale and he, *inter alia,* conspired to deliver methamphetamine, all that was conclusively established were smaller conspiracies to the same end between Tisdale and Horn. Capshaw argues that such a variance between the crime with which he was charged and the crime upon which he was convicted is fatal to that conviction.

In making his case, Capshaw relies exclusively upon federal case law. This constitutes appropriate recognition of our observation that Wyo. Stat. Ann. § 35–7–1042 (LEXIS 1999) is derived from 21 U.S.C. § 846, rendering federal case law on the latter "convincing authority when construing the former." *Apodaca v. State,* 627 P.2d 1023, 1027 (Wyo.1981). In resolving the variance argument, then, we look to the Tenth Circuit Court of Appeals for guidance:

> A variance arises when the evidence presented at trial establishes facts that are different from those alleged in the indictment. *Dunn v. United States,* 442 U.S. 100, 105, 99 S.Ct. 2190, 2193–94, 60 L.Ed.2d 743 (1979); *United States v. Powell,* 982 F.2d 1422, 1431 (10th Cir.1992), *cert. denied,* 507 U.S. 946, 113 S.Ct. 1356, 122 L.Ed.2d 736 (1993). However, no variance occurs when the government's theory on which the case was tried is the same as that charged in the indictment. *Dunn,* 442 U.S. at 106, 99 S.Ct. at 2194. Moreover, even if a variance exists, we will not reverse unless the variance affects the defendant's substantial rights. *Powell,* 982 F.2d at 1431; *United States v. Harrison,* 942 F.2d 751, 759 (10th Cir.1991) ("variance did not affect defendant's right to a fair trial").

*United States v. Meyers,* 95 F.3d 1475, 1485 (10th Cir.1996).

As *Meyers* suggests parenthetically, even in cases where an appellate court determines the existence of a variance, such a variance:

> 'is not fatal unless the defendant could not have anticipated from the indictment what evidence would be presented at trial or unless the conviction based on an indictment would not bar a subsequent prosecution.' 3 Charles Alan Wright, Federal Practice and Procedure § 516 at 27 (2d ed.1982); *see Stoner [United States v.]* 98 F.3d [527] at 536 [ (10th Cir.1996) ].

*United States v. Ailsworth,* 138 F.3d 843, 849 (10th Cir.1998).

Here, the information alleged, in pertinent part:

> [T]hat GARY CAPSHAW, late of the County aforesaid, from between on or about the 1st day of March, 1993, to on or about the 1st day of July, 1993, in the County of Natrona, in the State of Wyoming, did unlawfully conspire to deliver a controlled substance, to-wit: Methamphetamine, in violation of W.S.1977, as amended, § 35–7–1031 and § 35–7–1042[.]

Appended to the information filed against Capshaw was a detailed affidavit describing the information supplied to the authorities by Draper, detailing his business dealings with Tisdale, his relationship with Horn, and even repeating a narrative of the motel incident.

■ Capshaw might have sought a bill of particulars. He did not. Nor did he take any other sort of action before, during, or after his trial by which the district court might have been put on notice of his claim that the State's proof was at variance with the crime alleged. In general, matters not presented to the district court will not be considered on appeal, absent the implication of jurisdiction or the abridgment of fundamental rights. *Armijo v. State,* 678 P.2d 864, 867 (Wyo.1984).

> However, if it clearly appears from the record that such fundamental and prejudicial error has been committed as to amount to a denial of substantial justice, or

---

**2.** If the defense offered such a limiting instruc-tion, the record does not reflect it.

to deprive the defendant of a fair trial, the court should not hesitate to reverse the judgment and grant a new trial, although proper exceptions were not taken at the time.

*Parker v. State,* 24 Wyo. 491, 500, 161 P. 552, 554 (1916). What Justice Beard described in *Parker* is what we have come to know as plain error. The oft-repeated litany of requirements for the showing of plain error will not benefit an appellant unless: "(1) the record clearly reflects the incidents urged as error." *Seymour v. State,* 949 P.2d 881, 883 (Wyo.1997).

■ What the record reveals in this case, exclusive of the evidence of the motel incident, is testimony and exhibits which establish a conspiracy involving Capshaw, Tisdale, Horn, Draper, and McIntosh. To be sure, it was Capshaw's *theory* that he was simply an unlucky bystander to a conspiracy between Horn, Tisdale, and the others. So stark, however, is the contrast between the State's case and the testimony of Horn that the jury was presented with a clear choice: Believe Horn and acquit Capshaw, or, believe the balance of the evidence adduced at trial and convict. Simply put, viewing the evidence in a light most favorable to the prosecution, as we are obliged to do, Horn was not a generally credible witness. The assertion that the State only proved a conspiracy between Horn and Tisdale is not supported by the record. There was no variance between the crime charged and the crime proven, and Capshaw's right to a fair trial was not violated.

### Admission of Conspirators' Guilty Pleas

For his final assignment of error, Capshaw challenges admission of evidence regarding guilty pleas entered by two of his alleged conspirators. Indeed, the record reveals that McIntosh admitted under prosecution questioning that she had been indicted in federal court on conspiracy charges stemming from her Wyoming activities with Capshaw, *inter alia,* and had received favorable treatment by the federal system conditioned upon her agreement to testify against him. More significantly, perhaps, Tisdale acknowledged, under prosecutorial questioning, that he had entered a guilty plea to conspiracy for which *he* received remarkably lenient treatment in return for his testimony against Capshaw:

[**Prosecutor**]: And when you pled guilty to conspiracy, who did you plead guilty to conspiring with?

. . . .

[**Tisdale**]: Gary Capshaw.

Capshaw acknowledges that it is clear from the record that no objection was interposed to the conspirators' testimony about their convictions. This absence of a contemporaneous objection obliges us to apply the plain error standard of review. *Urrutia v. State,* 924 P.2d 965, 969 (Wyo.1996). Though we have previously mentioned the threshold requirement for a finding of plain error, it remains useful to articulate the plain error test in full:

Plain error will not be assigned unless: (1) the record clearly reflects the incidents urged as error; (2) appellant is able to demonstrate violation of a clear and unequivocal rule of law; and (3) it is shown that a substantial right of the appellant was materially abridged. *Guerra v. State,* 897 P.2d 447, 459 (Wyo.1995) (*quoting Lobatos v. State,* 875 P.2d 716, 721 (Wyo. 1994)).

*Seymour,* 949 P.2d at 883.

There is no need to dwell upon the threshold requirement of record clarity. Beyond question, two of Capshaw's conspirators were allowed to reveal their guilty pleas stemming from their involvement in the charged conspiracy.

■ We have long held that "when two persons are indicted for separate offenses growing out of the same circumstances, the fact that one has pleaded guilty is inadmissible against the other." *Kwallek v. State,* 596 P.2d 1372, 1375 (Wyo.1979). The vitality of this rule is amply demonstrated by *Kwallek.* There, when a contemporaneous objection was lodged with respect to a conspirator's testimony, this Court had no difficulty holding that admission of that guilty plea evidence constituted prejudicial error presaging reversal of Mr. Kwallek's conviction and remand for a new trial. *Kwallek,* 596 P.2d at 1376. As Capshaw points out, Mr. Justice

Jackson clearly explained the basis for this unequivocal rule:

> It is difficult for the individual to make his own case stand on its own merits in the minds of jurors who are ready to believe that birds of a feather are flocked together. If he is silent, he is taken to admit it and if, as often happens, co-defendants can be prodded into accusing or contradicting each other, they convict each other.

*Krulewitch v. United States,* 336 U.S. 440, 454, 69 S.Ct. 716, 723, 93 L.Ed. 790, 800 (1949) (Jackson, J., concurring in judgment and opinion).

■ In short, there can be no doubt that the appellant's right to a fair trial embraces his right not to be convicted, in whole or in part, upon the guilty pleas of his conspirators. *Ross v. State,* 930 P.2d 965, 968 (Wyo. 1996).

■ Thus, under the plain error standard, we are left to ponder only the third prong of that test: Whether Capshaw has shown that a substantial right of his was materially abridged. The State urges us to draw a parallel between this case and the one against Chad Urrutia, alleging that the evidence which convicted Capshaw was more than sufficient, exclusive of the offensive guilty plea testimony. *Urrutia,* 924 P.2d at 970.

Although many of the witnesses against Capshaw were drug users and inadvertently manifested the deleterious effects of drug use through their inability to recall specific dates, there was abundant testimony implicating him in a conspiracy to purchase methamphetamine at low California prices for profitable resale in the Casper market. Tisdale was clear, temporally and otherwise, as to the March 22, 1993, incident in which he was arrested for DUI when he went to assist Capshaw and Horn. Shortly thereafter, Draper observed Capshaw's presence during the weighing and repackaging of the product obtained on the March 22, 1993, trip. Such presence is corroborative of the underlying conspiracy. *Urrutia,* 924 P.2d at 969.

Moreover, the veracity of Draper's observations was confirmed when the search warrant, based upon her information, yielded quantities of methamphetamine and cash, along with the scales and repackaging materials she had described. Both Draper and McIntosh specifically described deliveries of methamphetamine made to them by Capshaw. For McIntosh, one delivery to her was a gesture of gratitude for her company on Capshaw's last buying trip to California. Draper, whose information to the police was the basis for the search warrant, found out soon after that warrant was issued that Capshaw's motives for delivery could be more sinister:

> [**Draper**]: ... And Gary came out of the back room. And he informed me he'd made up a syringe for me to use.
>
> . . . .
>
> [**Prosecutor**]: Did you use the syringe Mr. Capshaw provided to you?
>
> [**Draper**]: Yes.
>
> . . . .
>
> [**Prosecutor**]: Why did you use it on that occasion?
>
> [**Draper**]: The topic of conversation, before he came out, when he was fixing this up, was—there was a friend of theirs, a user of theirs, that was very paranoid. And the topic was how to tell if people are going against you. And one of the ways is if they did no longer use drugs around you, or you never seen them anymore. So I felt the pressure of—I couldn't let them know.

Even Horn, whom Capshaw scapegoated as the "real conspirator," implicated the appellant when cross-examined by the prosecutor:

> [**Horn**]: My general purpose for going to California was to get drugs. Nobody else—
>
> [**Prosecutor**]: But did Mr. Capshaw know that?
>
> [**Horn**]: I imagine he did. He was pretty gung ho about it.
>
> [**Prosecutor**]: You weren't secretive about it, you let him know what your intentions were?
>
> [**Horn**]: I believe I did, yes sir,

[Prosecutor]: And after you made those intentions clear, he introduced you to Mr. Tisdale, is that correct?

[Horn]: Yes sir.

. . . .

[Prosecutor]: So this first time, how much methamphetamine did you get?

[Horn]: Quarter pound.

[Prosecutor]: How much did it cost?

[Horn]: $2,500.

[Prosecutor]: Who was present when you obtained it?

[Horn]: Myself and [Capshaw] and [Tisdale].

Indeed, Capshaw's strategy of maintaining that, while he was present, he was not a conspirator engendered difficulties beyond Horn's testimony. The strategy for discrediting the parade of witnesses adverse to Capshaw was to show that they had each accepted very favorable plea bargains as a *quid pro quo* for their testimony against him. This was made clear by defense counsel's opening statement:

And Mr. Tisdale, for coming here this week and speaking to you, ladies and gentlemen, is going to be free. By coming in here and pointing the finger at the person the state asks him to point his finger at, doesn't go to prison.

While the prosecutor makes no mention of the guilty pleas in closing argument, defense counsel again reminds the jury of Tisdale's plea in an effort to vitiate Tisdale's testimony:

[Tisdale] is charged as a conspirator. He could go back to prison, but by coming here and saying those two things [that he gave drugs to Mr. Capshaw and Mr. Capshaw gave him money], he doesn't go for [sic] prison, he goes back to California.

We agree with the State that there is sufficient evidence, in addition to the impermissible guilty plea evidence, to render the error harmless according to the rule of *Urrutia*. Furthermore, because Capshaw incorporated those guilty pleas into his trial strategy and invited the guilty plea testimony by his own opening statement, we cannot say that a substantial right was abridged in such a fashion as to require reversal under the plain error standard. *Ross*, 930 P.2d at 969; *see also United States v. Dunn*, 841 F.2d 1026, 1030–31 (10th Cir.1988); *also see* V. Woerner, Annotation, *Prejudicial effect of prosecuting attorney's argument or disclosure during trial that another defendant has been convicted or has pleaded guilty*. 48 A.L.R.2d 1016, esp. § 4 (1956 and Later Case Service).

 Finally, we offer this additional suggestion for the trial courts so as to deter similar potentially fatal errors from occurring in future cases. As noted above, as a general rule, admission of evidence that a codefendant or conspirator has pleaded guilty or been found guilty is not admissible in the trial of another codefendant or conspirator. If such evidence is introduced by the prosecution, it is error. Recently, we were compelled to reverse a conviction on these very grounds because the prosecution improperly used evidence of guilty pleas by co-defendants. *Mazurek v. State*, 10 P.3d 531, 535–541 (Wyo.2000). If no objection is interposed by the defense, we will review such an error under the plain error standard. Likewise, if an objection is made, the error is subject to review for harmless error. In either event, a clear and comprehensive instruction to the jury (whether requested by the defense or given by the trial court *sua sponte*) may have a salutary effect in either a plain error analysis or a harmless error analysis. Trial courts should be alert to this potential pitfall when a codefendant or conspirator is called as a witness for the prosecution under circumstances similar to the instant case. The prosecution should be cautioned about introducing the subject of a guilty plea or conviction into another defendant's trial, and the trial court should be alert to properly instruct the jury to disregard any such testimony should it be called to the jury's attention. As can be gleaned from a review of the American Law Reports annotation cited above, there are many circumstances where prejudice is not found. One significant factor in such a finding may be the guidance provided by the trial court in such an instance.

## CONCLUSION

Finding no error requiring reversal of Capshaw's conviction, we affirm the Judgment and Sentence of the district court in all respects.

THOMAS, Justice, concurring specially.

I am in accord with affirming Capshaw's conviction. I agree that there was no error committed in the admission of uncharged criminal conduct. I am also satisfied that there was no variance between the conspiracy that was charged and the conspiracy established by the evidence at trial.

I cannot, however, join in that aspect of the opinion that treats the claim of error under *Kwallek v. State*, 596 P.2d 1372 (Wyo. 1979). In *Ross v. State*, 930 P.2d 965, 972–73 (Wyo.1996), I reiterated the analysis of *Kwallek* that I advanced in *Urrutia v. State*, 924 P.2d 965, 971–72 (Wyo.1996). I still am satisfied that I articulated in those concurring opinions the correct way in which *Kwallek* should be applied. The net effect is that, in the absence of an objection by the defendant, which was not made in this case, there is no cognizable claim of error in an appeal from a conviction even under the plain error standard. I would hold on that issue that there is no error in this case in the absence of the requisite objection.

In decisions subsequent to *Kwallek*, this Court has disregarded the requirement for a timely objection at trial, and applied plain error analysis when evidence of a witness' factually related plea agreement was admitted. The dynamics at the trial that result in such testimony being offered are intriguing. The prosecution seeks to introduce the conviction or plea in order to manifest a posture of openness and candor, and blunt the effect of its introduction on cross-examination. As we said in *Schmunk v. State*, 714 P.2d 724, 739 (Wyo.1986):

> [O]pposing counsel may choose not to object to receipt of the offered evidence for many reasons. Trial strategy may dictate no objection; the opposing party may believe the offered evidence will be favorable; the opposing party may believe that im-

peachment may be more damaging and choose not to exclude the evidence.

For tactical reasons, the defendant may well prefer that the conviction come in during the prosecution's case-in-chief. The defense may prefer to focus cross-examination upon the details of the conviction and the deal the witness was able to make with the prosecution. On the other hand, the defense may perceive an advantage in first introducing the conviction on cross-examination. There may be instances in which the defense may prefer that the matter not be presented at all. In either of the latter instances, the defendant will object to the introduction of the information by the prosecution, and, as *Kwallek* holds, it will be prejudicial error to permit the presentation to proceed.

If no objection is posed by the defendant, the trial court or this Court cannot know whether the failure to object was inadvertent or tactical. If, in that equivocal atmosphere, we permit the invocation of the plain error rule in an appeal, the defendant enjoys the opportunity to fail to object to information he wants the prosecution to develop, but he still has tucked away in his briefcase a claim of error on appeal if the jury finds him guilty. That result is inherently unfair to the prosecution, and indeed justifies the correct rule articulated in *Kwallek*. In *State v. Marshall and Brown–Sidorowicz, P.A.*, 2 Kan.App.2d 182, 577 P.2d 803, 817 (1978), the Court of Appeals of Kansas ruled that failure to offer a timely objection to testimony about a witness' plea of *nolo contendere* bars a challenge on appeal. That rule was adopted in *Kwallek*, and we should now reaffirm that holding. I still am satisfied that, in the absence of a timely objection by the defendant to testimony about a witness' plea agreement or conviction, there is no cognizable claim of error on appeal even under the plain error standard. *Urrutia* and *Ross* should be overruled in this regard.

The approach suggested by the majority opinion may be palliative, but we will be left with an obligation to review the issue in every similar case. For me, a better approach would be to require that the matter be settled prior to trial. The prosecution could be required to disclose an intention to

offer such evidence, and if so, the defendant would be required to state whether an objection would be made. If the defendant manifests an intention to object, then the prosecution would not be permitted to offer the evidence. On the other hand, if the defendant did not announce the intention to object prior to trial, there would be no error arising out of its introduction by the prosecution. Invoking such a procedure, similar to that adopted in connection with W.R.E. 404(b), would definitively resolve the issue, and we would not find it included in the claims of error on appeal.

I agree to affirm Capshaw's conviction, but I would address the issue of the prior convictions differently.