2001 WY 66

**Hawley A. EARLL, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

No. 99–295.

Supreme Court of Wyoming.

July 31, 2001.

Representing Appellant: Sylvia Lee Hackl, State Public Defender; Donna D. Domonkos, Appellate Counsel; Tina N. Hughes, Assistant Appellate Counsel. Argument by Ms. Hughes.

Representing Appellee: Gay Woodhouse, Wyoming Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; Robin Sessions Cooley, Senior Assistant Attorney General. Argument by Ms. Cooley.

Before LEHMAN, C.J., and GOLDEN, HILL, and KITE, JJ.

GOLDEN, Justice.

[¶ 1] Appellant Hawley Anthony Earll, convicted as an accessory after the fact to the manufacture of methamphetamine in violation of Wyo. Stat. Ann. § 6–5–202(a)(b)(i) and § 35–7–1031(a)(i), contends that prosecutorial misconduct, a confrontation violation of the Sixth Amendment, and a violation of *Kwallek v. State,* 596 P.2d 1372 (Wyo.1979), require that we reverse his conviction. We hold that a reasonable possibility exists that the accused's right to a fair trial was affected by the error. The conviction cannot stand, and we reverse and remand for a new trial.

### ISSUES

[¶ 2] Earll presents the following issues for our review:

I. Did the prosecutor commit prosecutorial misconduct in her cross examination of Appellant, wherein she referenced alleged statements of Appellant's girlfriend that were never made?

II. Did the state's use of out of court statements of Appellant's girlfriend violate Appellant's Sixth Amendment right to confrontation?

III. Did the trial court err in refusing to order a new trial?

IV. Did the state's offer and the admission of testimony of Bunnie Larson and Samuel (Catfish) Yates that they were con-

victed of offenses arising out of the same circumstances leading to Appellant's trial, and the state's argument concerning those convictions, violate Appellant's right to have a trial on its own merits, constituting plain error?

The State rephrases the issues to be:

I. Whether Appellant was denied a fair trial because of the prosecutor's improper questions?

II. Whether Appellant's Sixth Amendment right of confrontation was violated and whether the trial court erred in denying Appellant's motion for reconsideration on the issue?

III. Whether the State improperly elicited testimony from Appellant's associates that they had been convicted of crimes similar to those for which Appellant was on trial?

## FACTS

[¶ 3] On December 31, 1998, Earll was a passenger in a car driven by Samuel "Catfish" Yates. Police suspected Yates of operating a methamphetamine lab in his trailer home and had him under surveillance. The police knew that Yates had a suspended driver's license, and when he was observed driving away from the trailer, the police pulled his vehicle over. Yates was arrested at that time for driving with a suspended license and not possessing proof of insurance or registration. Earll was not arrested. Instead, the police warned Earll to avoid Yates and to stay away from the trailer because of the suspected drug activity.

[¶ 4] Immediately after leaving Yates and the police, Earll returned to the trailer. Two individuals were at the trailer at that time: Bunnie Larson, Yate's girlfriend, and Tracy Cox, Earll's girlfriend. Shortly thereafter, the police, who were still watching the trailer, observed Earll and the two women leave the trailer with several bags. After loading the bags into a vehicle, the three attempted to drive off but the police quickly stopped them. The vehicle's owner, Cox, gave the police permission to search the vehicle, and Larson gave permission to search her bags. In a bag Earll had carried out of the trailer,

the police found a Pyrex dish containing a fresh batch of methamphetamine. Based on that discovery, Earll was arrested.

[¶ 5] At his trial on the charge of accessory after the fact to the manufacture of methamphetamine, Earll's fate came down to a determination of his credibility versus Yates' and Larson's credibility. The State called both Yates and Larson as witnesses. They testified that they had known Earll for several months and that he was aware of the existence of the methamphetamine lab. Both stated that Earll had not only smoked some methamphetamine, but had purchased some, the morning of the arrests. Larson testified that Earll had been the one who packed the bag containing the Pyrex dish.

[¶ 6] Against that damaging testimony, Earll took the stand. Earll claimed that Yates was only a casual acquaintance and that he was with them the day of the arrests only because a mutual friend had asked him to help Yates fix his car. Earll denied any knowledge of the methamphetamine lab, let alone that he had smoked or purchased any that day. Similarly, Earll denied that he had packed the bag, disclaiming all knowledge of its contents. He claimed that since Larson had three bags to carry, he was being a gentleman and carried the largest bag for her. During the prosecutor's cross-examination of Earll, the prosecutor engaged in the following questioning which, the State concedes, misrepresented testimony by Earll's girlfriend, Tracy Cox, at an earlier hearing:

[Prosecutor]: Tracy is your girlfriend, is that right?

[Earll]: That's correct.

Q: And you claim you didn't—how long have you been, I guess, with Tracy?

A: Approximately, five years.

Q: In fact, she was involved in this other crime with you; is that right?

A: Yeah. She kind of was a victim of it, yes.

Q: She was convicted?

A: Yes, of conspiracy.

Q: Trust Tracy?

A: Yeah, I have to. I've been with her long enough.

Q: Would it surprise you to know that Tracy in another court hearing has already told the Court under oath that you, in fact, did smoke methamphetamine with her and Catfish and Bunnie that morning on December 31?

A: I don't know anything about that, no.

Q: Would it surprise you? Would you think she's lying, too?

A: I—I would be surprised she would say something like that because it didn't happen.

Q: So she must be lying, too?

A: If she said that, I—I don't under—I don't know why she was—

[Defense Counsel]: I object, your Honor. I don't think she said that. I think she admitted she, Tracy, smoked. I don't think she said that [Earll] had smoked.

[Prosecutor]: Yes, she did.

[Defense Counsel]: I would like to see it in the transcript because I don't think she did and I was there.

Q: Did you and Catfish—

[The Court]: Are you two wanting to be placed under oath, both of you?

[Prosecutor]: No, Judge. We'll move on.

[The Court]: If you want to give testimony, we'll put you both under oath and then I'll cross-examine you. (Laughter.)

[Prosecutor]: We'll move on.

Six short questions later, this exchange occurred:

[Prosecutor]: [Y]ou claim that you weren't smoking that morning, even though everyone else that was there says you were?

A: That's right. I was not.

Later, during closing argument, the prosecutor made the following statements:

The police asked [Earll] if he knew of anything funny going on in the trailer. "Oh, no, huh-uh. Don't know anything about drugs." But the testimony was, folks, that he was smoking the methamphetamine that morning. He was smoking it with his girlfriend, Tracy. He was smoking it with Catfish. And he was smoking it with Bunnie. The only person that says he wasn't is the Defendant.

[¶ 7] After a two-day trial, the jury rejected Earll's version of the events and returned a guilty verdict. Before sentencing, Earll filed a motion for a new trial based on the prosecutor's misrepresentation of the testimony of Tracy Cox at the earlier hearing and the prosecutor's reference to that testimony during closing argument.

[¶ 8] The trial court, while acknowledging that the prosecutor had indeed misrepresented Cox's testimony, nevertheless denied the motion on the grounds that the jury had been instructed at the beginning of trial and before deliberations after the close of evidence that comments of counsel regarding the alleged testimony were not evidence. Subsequently, Earll filed a motion to reconsider the denial of the motion for a new trial in light of the decision in *Lilly v. Virginia*, 527 U.S. 116, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999). Earll claimed that, pursuant to *Lilly*, the misuse of Cox's testimony had violated his constitutional right to confrontation. After concluding that Earll had received a fair trial, the trial court denied the motion for reconsideration. Earll has now appealed.

### DISCUSSION

#### *Prosecutorial Misconduct*

[¶ 9] Prosecutorial misconduct "has always been condemned in this state." *Valerio v. State*, 527 P.2d 154, 156 (Wyo. 1974). Whether such misconduct has been reviewed on the basis of harmless error, W.R.Cr.P. 52(a) and W.R.A.P. 9.04, or on the basis of plain error, W.R.Cr.P. 52(b) and W.R.A.P. 9.05, this Court has focused on whether such error, as the State concedes exists in this case, affected the accused's "substantial rights." The accused's right to a fair trial is a substantial right. Wyo. Const. art. 1, §§ 6, 9, and 10; *and see, e.g.*, *Jones v. State*, 580 P.2d 1150, 1154 (Wyo. 1978). Before we hold that an error has affected an accused's substantial right, thus requiring reversal of a conviction, we must conclude that, based on the entire record, a reasonable possibility exists that, in the absence of the error, the verdict might have been more favorable to the accused. *Jones v. State*, 735 P.2d 699, 703 (Wyo.1987). We read this standard to be in consonance with

the standard followed by the United States Supreme Court:

> Some aids to right judgment may be stated more safely in negative than in affirmative form. Thus, it is not the appellate court's function to determine guilt or innocence. Nor is it to speculate upon probable reconviction and decide according to how the speculation comes out. Appellate judges cannot escape such impressions. But they may not make them sole criteria for reversal or affirmance. Those judgments are exclusively for the jury, given always the necessary minimum evidence legally sufficient to sustain the conviction unaffected by the error.
>
> But this does not mean that the appellate court can escape altogether taking account of the outcome. To weigh the error's effect against the entire setting of the record without relation to the verdict or judgment would be almost to work in a vacuum. In criminal causes that outcome is conviction. This is different, or may be, from guilt in fact. It is guilt in law, established by the judgment of laymen. And the question is, not were they right in their judgment, regardless of the error or its effect upon the verdict. It is rather what effect the error had or reasonably may be taken to have had upon the jury's decision. The crucial thing is the impact of the thing done wrong on the minds of other men, not on one's own, in the total setting.
>
> This must take account of what the error meant to them, not singled out and standing alone, but in relation to all else that happened. And one must judge others' reactions not by his own, but with allowance for how others might react and not be regarded generally as acting without reason. This is the important difference, but one easy to ignore when the sense of guilt comes strongly from the record.
>
> If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand, except perhaps where the departure is from a constitutional norm or a specific command of Congress. But if one cannot say, with fair assurance after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.

*Kotteakos v. United States,* 328 U.S. 750, 763–65, 66 S.Ct. 1239, 1247–48, 90 L.Ed. 1557 (1946) (citations and footnotes omitted); *and see, e.g., Brecht v. Abrahamson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 1721, 123 L.Ed.2d 353 (1993).

[¶ 10] The State concedes that "[r]eview of Tracy's trial transcript did, indeed, reveal that she had not testified the way the prosecutor said she had." Moreover, the State concedes that the prosecutor's questioning was improper. In the post-trial hearing on the accused's motion for new trial based on the prosecutor's error, the trial court reviewed Cox's testimony and found that she had not testified as the prosecutor had represented to the accused and the jury during her cross-examination of the accused. The trial court also candidly admitted that the prosecutor's closing argument reference about the accused's smoking methamphetamine that morning of the arrest "just went right by me. I didn't even catch that." Moreover, the trial court commented about the impropriety of the prosecutor's error in light of that court's awareness of a disturbing habit that lawyers practicing in that court's jurisdiction have. The court remarked:

> They ask improper impeachment questions. They ask questions such as, "Would it surprise you to know or to learn or to hear that a witness in another hearing has stated thus and such?" And following it up with a question "And would that"—"and so would that person, other person, be lying then?"
>
> That's not the way that it should be done....
> * * *

[I]t's been something I've noticed in just about every trial I have.

* * *

But I'm not going to try to teach them because they resent that.

[¶ 11] The accused's counsel presented to the trial court the essence of his position, the fundamental unfairness of the prosecutor's telling, expressly and by innuendo, the jury the untruth that even the accused's trusted girlfriend testified contrary to the accused's version of the facts. The trial court then expressed the dilemma, "And the Court can't know one way or another can't know whether the jury thought that was significant or whether they didn't pay any attention to it at all." In reply, the prosecutor maintained that the error did not affect a substantial right because Yates' and Larson's statements "were sufficient for the jury to believe or not believe Mr. Earll . . . when he took the stand and said, 'No, I wasn't doing it.' " Concluding that the error did not affect the jury's verdict, the trial court denied the motion for a new trial.

[¶ 12] Applying either harmless error or plain error analysis, we have several concerns regarding the error in question given the quality of the prosecution's case against the accused. One of our concerns is what we generally know about a jury's view of a prosecutor. Jurors recognize the prosecutor's role as a leader of law enforcement in their community; they naturally regard the prosecutor as a symbol of authority; that recognition and regard may impress a jury, causing jurors to give significant weight to the words of a prosecutor. *United States v. Herberman,* 583 F.2d 222, 230 (5th Cir.1978); *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed.2d 1314 (1935); ABA Standards for Criminal Justice Prosecution Function and Defense Function, Standard 3–5.8, commentary, at 107 (3d ed.1993).

[¶ 13] Another of our concerns is the nature of the error in question. Not only did the prosecutor misrepresent to the jury, as sworn testimony before the court, the testimony of the accused's trusted girlfriend in an effort to impeach the accused's testimony, but the prosecutor also declared to the jury the prosecutor's personal knowledge of that trusted girlfriend's sworn testimony.

[¶ 14] We consider these concerns in the context of the quality of the prosecution's case against the accused. The State maintains, as the prosecutor did below, that this was not a particularly close case. As the prosecutor explained to the trial court, Yates' and Larson's statements "were sufficient for the jury to believe or not believe Mr. Earll. . . ." We disagree. Yates was a five-time felon, and Larson was his girlfriend. Both had benefited from plea bargains from the prosecutors. According to the trial judge, Yates had received "about the sweetest deal of anybody—that anybody could have wanted." The trial judge had a particularly interesting view of Yates, which he shared with the jury after it had returned its verdict. The trial judge observed:

> I want you to know that I thought that Mr. Catfish was one of the worst individuals that's been in this courtroom in a long, long time. A little more than a year ago, we had three individuals in this courtroom that were charged with the brutal murder of an eighteen year old girl. With the exception of one of the four people who were charged with that crime, Mr. Catfish, in my opinion, was worse than any of those people. That was one bad actor and he will remain a bad actor. I just wanted to tell you folks what my opinion of that man was and is.

[¶ 15] In this prosecution, the prosecutor pitted Yates' and Larson's word against the accused's. The prosecutor's two star witnesses were vulnerable to impeachment because of their unsavory criminal history and the "sweet" plea bargains given them in exchange for their testimony against the accused. To bolster their credibility in the eyes of the jurors, and consequently bolster the case against the accused, the prosecutor told the jurors that even the accused's trusted girlfriend, Tracy Cox, testified under oath that, despite the accused's denial, the accused smoked methamphetamine with the three of them on the morning in question, permitting the inference to be drawn that the accused knew about Yates' and Larson's

methamphetamine operation. The trouble was that was not true.

[¶ 16] The State urges us to take into consideration, and we have, the trial court's instruction to the jury both at the start of the trial and at the start of jury deliberation to disregard as evidence anything counsels say in the course of the trial; the presumption that jurors follow instructions; and the failure of the accused's counsel to request a curative instruction from the court and to make appropriate objections. In the exercise of our judgment on this issue, we have weighed the nature and gravity of the error, the prosecutor's duty as the representative of a sovereignty to see that justice is done and refrain from improper methods, the confidence that the average juror has that the prosecutor will faithfully perform these duties, the quality of the prosecution's case, and the factors which the State urges upon us. In the final analysis, we must judge the issue—what the error meant to the jurors in relation to all else that happened. We must judge others' reactions, not our own. "[I]mproper suggestions, insinuations and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none." *Berger*, 295 U.S. at 88, 55 S.Ct. at 633.

[¶ 17] From our careful examination of the record, we conclude that the case against the accused was not strong. Earll was not convicted of manufacturing methamphetamine but rather only of being an accessory after the fact. The main testimony against Earll came from Yates and Yates' girlfriend. Yates had a long criminal record, was obviously of impeachable character given the trial judge's low opinion of him, and had received the "sweetest" deal ever seen by the trial judge. Yates' girlfriend also benefited from a plea bargain. The credibility of both witnesses was highly vulnerable to attack by the defense. This case is properly characterized as weak. We hold that in these circumstances unfair prejudice to the cause of the accused is so highly probable that we are not justified in assuming its nonexistence. We cannot say, with fair assurance, that the jury's verdict against the accused was not substantially swayed by the error. We hold

that a reasonable possibility exists that the accused's right to a fair trial was affected by the error. The conviction cannot stand, and we reverse and remand for a new trial. Because the accused's issues on the denial of new trial and Sixth Amendment confrontation are also based on the prosecutor's error, we need not consider them in light of our decision on this issue.

### Testimony Regarding Witnesses' Guilty Pleas

[¶ 18] Earll contends that the prosecutor elicited testimony from Yates and Larson regarding guilty pleas which arose out of the events on the morning of December 31, 1998. He claims this contravened this Court's decision in *Kwallek v. State*, 596 P.2d 1372 (Wyo.1979), and its progeny. Earll also claims that the prejudice associated with the introduction of such testimony was exacerbated when the prosecutor's closing argument emphasized to the jury that Yates and Larson had taken their punishment. No objection was made to the testimony in question; thus, our review would be confined to a search for plain error which would be established if:

> (1) the record clearly reflects the incidents urged as error; (2) appellant is able to demonstrate violation of a clear and unequivocal rule of law; and (3) it is shown that a substantial right of the appellant was materially abridged.

*Capshaw v. State*, 11 P.3d 905, 911 (Wyo. 2000) (quoting *Seymour v. State*, 949 P.2d 881, 883 (Wyo.1997)). Because we are reversing and remanding for new trial on other grounds, we need not decide this issue; however, we would refer the State and the accused to the discussions of this issue in *Capshaw* and *Mazurek v. State*, 10 P.3d 531, 535–40 (Wyo.2000).

[¶ 19] "We have long held that 'when two persons are indicted for separate offenses growing out of the same circumstances, the fact that one has pleaded guilty is inadmissible against the other.' " *Capshaw*, 11 P.3d. at 911 (quoting *Kwallek*, 596 P.2d at 1375). As we recently noted, the rationale behind this rule was set forth many years ago by Mr. Justice Jackson:

It is difficult for the individual to make his own case stand on its own merits in the minds of jurors who are ready to believe that birds of a feather are flocked together. If he is silent, he is taken to admit it and if, as often happens, co-defendants can be prodded into accusing or contradicting each other, they convict each other.

*Krulewitch v. United States,* 336 U.S. 440, 454, 69 S.Ct. 716, 723, 93 L.Ed. 790, 800 (1949) (Jackson, J., concurring in judgment and opinion); *Capshaw,* 11 P.3d at 912.

[¶ 20] In *Mazurek,* we set forth several nonexhaustive factors to be considered when evaluating whether there was prejudicial plain error at the trial level, including:

(1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and prejudice the accused;

(2) whether the remarks were isolated or extensive;

(3) the strength of competent proof to establish guilt, absent the remarks;

(4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters;

(5) the presence or absence of a limiting instruction;

(6) whether there was a proper purpose for introducing the conviction;

(7) whether the conviction was improperly emphasized;

(8) whether the conviction was used as substantive evidence of guilt;

(9) whether the error was invited by defense counsel;

(10) whether the failure to object could have been the result of tactical decisions; and

(11) whether, in light of all the evidence, the error was harmless.

*Mazurek,* 10 P.3d at 539 (citing *United States v. Mitchell,* 1 F.3d 235, 241–42 (4th Cir.1993)).

[¶ 21] We reverse and remand for new trial.

HILL, Justice, dissenting.

[¶ 22] A review of the record has convinced me that the prosecutor's misconduct was a small part of the trial and does not rise to the level of prejudice accorded by the majority. Therefore, I must respectfully dissent from the reversal of the appellant's conviction.

[¶ 23] In view of all of the evidence at trial, the one isolated exchange during cross-examination did not affect the outcome of the trial. The jury was afforded the opportunity to see and hear Earll, as well as Catfish and Bunnie, and weigh for itself the respective credibility of each; warts, plea bargains and all. The testimony from Catfish and Bunnie was that Earll had not only smoked methamphetamine that morning but also had, in fact, purchased a quantity of it from Catfish. There was ample testimony that Earll was good friends with Catfish and was very familiar with the methamphetamine operations at the trailer, not to mention the fact that law enforcement personnel observed Earll transporting a bag containing methamphetamine. In that light, the statements regarding Cox's alleged testimony were merely cumulative.

[¶ 24] In addition to the testimony of Catfish and Bunnie, the jury was instructed regarding statements made by counsel. The prosecutor's misrepresentations were quickly countered and denied not only by defense counsel but also by the defendant himself. The trial judge immediately made it clear that the comments were not evidence, as indicated by his intimations that if counsel wanted to continue, they would be put under oath. Rather, the instruction given by the trial court was specifically created for situations such as this one. In the absence of any evidence to the contrary, we should assume that the jury has the ability to follow instructions and does, in fact, abide by those instructions.

[¶ 25] Furthermore, the closing argument did not constitute misconduct. The prosecutor's statement that Earll was the only person who said he had not smoked methamphetamine was true. The other two witnesses to the events of that morning and who testified during the trial stated that Earll had indeed smoked methamphetamine that morning. The prosecutor's statement does not mention any statements by Tracy

Cox at all. In fact, it is clear from the context of the quote that the prosecutor was referring to testimony given at the trial. That was a permissible argument based on the evidence adduced at trial.

[¶ 26] The gravity the majority applies to the prosecutorial misconduct is based largely on the conventional belief that a jury automatically views a prosecutor in a favorable light, thus heightening the possibility of prejudice arising from perceived prosecutorial misconduct. In view of some recent cases before national audiences, it may be that such conventional wisdom is open to reconsideration.

[¶ 27] But assuming for the sake of this opinion that a jury will bring a certain regard for the prosecutor to the beginning of a trial, surely no one believes that such regard is immune to attack or erosion during the course of a trial.

[¶ 28] Here, as soon as the prosecutor's misstatement was made, both the defense counsel and the defendant himself vigorously contradicted it. The trial court immediately corrected, one might say ridiculed, counsel,

eliciting laughter from the jury. Later, after instructing the jury as to how to view the prosecutor's statements, the trial court saw fit to comment on the sins of prosecutors, generally. Under these circumstances, given this climate, any exalted position afforded this prosecutor most certainly was destroyed. Yet, the jury weighed all that it had heard and seen and returned a conviction.

[¶ 29] Under these circumstances, viewing the trial record in its entirety, I can only conclude that the prosecutor's misuse of Tracy Cox's alleged testimony did not constitute substantial prejudice depriving Earll of a fair trial, and that Earll was convicted in spite of prosecutorial misconduct and the fallout it generated, not because of it. I would affirm the conviction.