2003 WY 84

**James Lynn SIMMONS, Jr.,**
**Appellant (Defendant),**

v.

**The STATE of Wyoming,**
**Appellee (Plaintiff).**

No. 01–250.

Supreme Court of Wyoming.

July 15, 2003.

Kenneth M. Koski, State Public Defender; Donna D. Domonkos, Appellate Counsel; and Tina N. Kerin, Senior Assistant Appellate Counsel, Representing Appellant.

Hoke MacMillan, Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney

General; and Sean W. Scoggin, Special Assistant Attorney General, Representing Appellee.

Before HILL, C.J., and GOLDEN, LEHMAN, KITE, and VOIGT, JJ.

KITE, Justice.

[¶ 1] A jury convicted James Simmons, Jr. of child abuse and intimidating a witness. Mr. Simmons appeals, claiming prosecutorial misconduct, insufficiency of the evidence, and denial of a fair trial because of remarks made by a spectator during a witness' testimony and because the jury saw him in shackles. We hold the prosecutor's repeated attempts to introduce evidence of prior bad acts combined with his repetition of the inaudible testimony from the state's prime witness constituted prosecutorial misconduct requiring reversal and remand for a new trial.

## ISSUES

[¶ 2] Mr. Simmons raises the following issues:

I. Did the trial court err in forcing [Mr. Simmons] to walk to the witness stand, in front of the jury, while shackled, after defense counsel had requested a brief recess to unshackle [him], when the crux of the trial court's "reason" for doing so was that the trial was moving too slowly and [Mr. Simmons'] trial counsel should have made the request sooner?

II. Was [Mr. Simmons] denied a fair trial, and therefore due process of law, when a courtroom spectator audibly called one of the defense witnesses a "liar" as the defense witness testified, and the trial court did nothing to cure the problem?

III. Did the prosecutor commit misconduct by violating the trial court's pretrial order, referencing juvenile conduct of [Mr. Simmons], questioning the alleged victim . . . about unnoticed prior bad acts of [Mr. Simmons], arguing [Mr. Simmons'] character as a reason to convict and repeatedly leading the alleged victim-witness . . . throughout the course of her testimony (and repeating her answers to the jury)?

IV. Was there insufficient evidence to convict [Mr. Simmons], given the manner in which the jury was instructed?

The state restates the issues as follows:

I. Whether [Mr. Simmons] was prejudiced by walking to the witness stand in front of the jury while shackled?

II. Whether [Mr. Simmons] was denied a fair trial when a courtroom spectator whispered "liar" to her husband as a defense witness testified?

III. Did the prosecutor commit prejudicial misconduct when he asked questions regarding [Mr. Simmons'] prior bad acts and when he repeated the answers of a witness during direct examination?

IV. Was there sufficient evidence to convict [Mr. Simmons], in light of the manner in which the jury was instructed on the elements of the crimes with which he was charged?

## FACTS

[¶ 3] Mr. Simmons and his girlfriend, Natalia Bradford, are the parents of two young children: a boy, B.S.; and a girl, A.S. At the time of the events giving rise to this case, B.S. was twenty months old, and A.S. was three years old. In the late morning of March 29, 2001, a neighbor came to Mr. Simmons' apartment in Casper. B.S. met her at the door. The neighbor noticed bruises on B.S.'s face and dried blood around his lips and ear. She asked Ms. Bradford what happened. Receiving no response, the neighbor took the children upstairs to her apartment. Once upstairs, she and her husband noticed more bruising on B.S.'s body. They telephoned the Department of Family Services (DFS). Sometime later, two police officers arrived along with Joanne Robinson, an investigator from DFS. In the meantime, Ms. Bradford had retrieved the children and taken them back downstairs.

[¶ 4] The officers and Ms. Robinson went to Mr. Simmons' apartment, observed B.S., and questioned Mr. Simmons about the bruises on the boy's forehead and back. The testimony concerning Mr. Simmons' response was somewhat inconsistent. Ms. Robinson testified Mr. Simmons told her

B.S. fell down a lot, hitting his head and back. John Hatcher, a Casper police officer, testified Mr. Simmons said B.S. threw a fit the night before in which he flung himself down onto the floor and hit his head on a toy. Law enforcement took the boy into protective custody and turned him over to DFS. Ms. Robinson took him to the hospital where he was examined by Mel Meyer, the emergency room physician. Dr. Meyer's report reflected the following assessment of B.S.'s condition: dehydration, multiple contusions/abrasions, prominent subarachnoid space, and neglect/abuse. Dr. Meyer testified B.S. had suffered nonaccidental trauma, meaning the bruises were not the result of falling down. He also testified the subarachnoid space was consistent with previous trauma.

[¶ 5] Patrick Carr, the lead detective on the case, arrived at the hospital while B.S. was being examined. Officer Carr spoke to Mr. Simmons, who was in the hospital waiting room. Mr. Simmons told Officer Carr that B.S. fell down a lot and had tantrums in which he banged his head against the wall. Officer Carr asked Mr. Simmons if he would come down to the police station for a more thorough interview. Mr. Simmons agreed. An interview was conducted at the police station, and Mr. Simmons again denied causing B.S.'s injuries.

[¶ 6] The next morning, Officer Carr interviewed Ms. Bradford, who initially told him the same story as Mr. Simmons. Toward the end of the interview, however, she said Mr. Simmons had on occasion put B.S. in the corner and held his head against the wall and had done so on March 28, 2001. In addition, after initially denying that Mr. Simmons ever spanked the boy, she changed her story and said he had spanked B.S. in the past. She also advised the officer that she was planning to leave Mr. Simmons.

[¶ 7] Officer Carr then interviewed Mr. Simmons again who was initially cooperative and willing to answer questions. During this interview, Officer Carr confronted Mr. Simmons with the new information obtained from Ms. Bradford. Mr. Simmons said he did put B.S. in the corner but did not do so forcefully and he held him by his shoulders,

not his head. He also admitted spanking B.S. on his diaper. When Officer Carr asked him about Ms. Bradford's plans to leave him, Mr. Simmons said he did not wish to speak anymore and requested an attorney. Officer Carr concluded the interview and placed Mr. Simmons under arrest.

[¶ 8] The following Monday, Ms. Bradford came back to the station and asked to speak with Officer Carr. During this interview, she told him she lied during the previous interview because Mr. Simmons had threatened to kill her if she told the truth. Now that he was in jail, she said she felt safe in coming forward with the truth. She said Mr. Simmons was coming down from "cranking" on March 28, 2001, they got into a fight, and he began hurting B.S. She said Mr. Simmons forced B.S. into the corner and, whenever the boy turned or tried to walk away, Mr. Simmons grabbed him by the head and forced him back, holding his forehead against the walls. She further reported Mr. Simmons repeatedly grabbed B.S., picked him up, and threw him on the bed. She also said he kicked the boy in the stomach when he was down on the floor. She told Officer Carr that, when she tried to intervene, Mr. Simmons hit her and pulled out a clump of her hair.

[¶ 9] Mr. Simmons was charged with child abuse, intimidating a witness, and battery. The latter two charges were based upon Ms. Bradford's allegations that Mr. Simmons threatened to kill her if she told the truth and hit her when she attempted to intervene in his abuse of B.S. Mr. Simmons was tried before a jury beginning July 30, 2001. On August 1, 2001, the jury found Mr. Simmons guilty of child abuse and witness intimidation and acquitted him of battery. The trial court sentenced him to serve two consecutive terms of not less than forty-eight months nor more than sixty months in the Wyoming State Penitentiary.

## DISCUSSION

### A. Prosecutorial Misconduct

[¶ 10] Mr. Simmons contends prosecutorial misconduct occurred at several stages during the trial. He claims the prosecutor

repeatedly solicited prohibited testimony concerning prior bad acts, improperly referred to prior bad acts during his closing argument, and committed misconduct by repeating Ms. Bradford's testimony in response to his questions. Mr. Simmons asserts the cumulative effect of these instances of misconduct denied him a fair trial.

[¶ 11] Looking first to the assertion that the prosecutor solicited testimony of prior bad acts, we find the following relevant facts in the record. Prior to trial, defense counsel filed a motion asking the state to provide notice of its intent to introduce evidence of prior bad acts under W.R.E. 404(b). The record contains no such notice, leaving us to conclude the state did not notify the court or the defense that it intended to introduce such evidence. Although there are references by the trial court to pretrial rulings prohibiting evidence of prior bad acts, we have been unable to locate any such ruling in the record before us.

[¶ 12] At trial, during the state's redirect examination of Ms. Bradford, the following exchange occurred:

Q Was he on probation in Texas?

[DEFENSE COUNSEL]: Objection, Your Honor, I don't know how this is relevant.

THE COURT: I'll sustain on relevancy.

. . . .

Q Now, had you related the incident that occurred on March 28th, was there any other incident where the Defendant had attacked you in that manner?

[DEFENSE COUNSEL]: Objection, Your Honor. We're once again going beyond the scope of the original direct and now we're going into matters that could be 404(b) evidence of prior bad acts that hadn't been noticed.

[PROSECUTOR]: Your Honor, I think I made the same objection, her ability as a parent, her mother is relevant, but now the Defendant's ability to be a father and what he's doing is not relevant?

THE COURT: I'll sustain. We have a battery claim in this case and I think that charge and that incident needs to stand on its own. I do think that balancing out

404(b) and also relevancy and 403 of the Wyoming Rules of Evidence that we have been going into an area I think we need to stay out of. So I'll sustain the objection.

Then, during the state's cross-examination of Mr. Simmons' mother, the following discussion occurred:

Q. . . . When your son was in trouble in Texas, he was also placed on probation, wasn't he?

[DEFENSE COUNSEL]: Objection, Your Honor. We're getting to 404(b) material here and we've already discussed that and had a ruling on it.

[PROSECUTOR]: Your Honor, she's testified, they opened the door to his character and they opened the door all the way back to 1997 in Texas and what a good father he was and how much time he spent with the kids and they opened the door to his character in regard to this. It's not 404(b) now, Your Honor. It's character evidence of the Defendant.

THE COURT: I'll sustain the objection. I think that consistent with the pretrial rulings and with my feeling there needs to be some bounds to inquiry in this area. I'll sustain.

Despite the trial court's ruling, the prosecutor later asked the witness again whether Mr. Simmons was on probation in Texas. He also raised the issue of prior bad acts in the following exchange:

Q Correct me if I'm wrong, but wasn't he placed in the Wyoming Boys School?

[DEFENSE COUNSEL]: Your Honor, I object to that as a juvenile record but beyond the scope.

[PROSECUTOR]: This doesn't go to criminal conduct, Your Honor. This goes to raising her son—

THE COURT: Please approach, if you would, counsel.

(Proceedings held at the bench.)

THE COURT: I'm inclined to come down very hard on the prosecution. You've been tap dancing around other bad acts, conduct, convictions. I know perhaps the door has been opened to part of it, but

I think this inquiry, as I see it, is in violation of the pretrial order and I think you're trying to continue to beat in every way and every angle you can the Defendant's prior criminal record.

I have to agree that juvenile court matters are confidential and I think perhaps there was some discussion and some general opinions from this witness that may relate to her son's background, but I think attempting to impeach or inquire in this area is completely improper. But I'll allow you to convince me and tell me why I'm wrong, giving your view of why you need to inquire about juvenile convictions and juvenile dispositions.

[PROSECUTOR]: Your Honor, I'm not going to go into that area any further. I think the Court has made your position clear. It's just, Your Honor, that they can come in and put the Defendant's character into issue by indicating what a great son he was and father, and I'm trying to establish that's certainly not the case. I, as the prosecution, can't do that in the case in chief.

They opened the door to that both in their opening statement and in numerous questions they have been asking that witness and I believe it's relevant because they have opened the door.

THE COURT: Anything else, [defense counsel]?

[DEFENSE COUNSEL]: I agree with the Court and say that we certainly admitted to the warrant and the charges in Casper that he was serving in October, and I have no objection to the discussion of that felony, which is the only felony on his record, and would ask that he be restrained, limited only to that particular matter.

THE COURT: Okay. Well, I'll rule that I'll sustain the objection and I'm going to instruct the prosecution that I do not want any more questioning in this area. I feel it's improper. It's beyond the scope of the rulings I made pretrial in this case as to other bad acts.

If you want to go into other areas, let's do it outside the presence of the jury and you make an offer of proof as to what other criminal conduct and bad acts you specifically want to inquire of this witness. Thank you.

(Proceedings held in open court.)

THE COURT: After conference at this bench, the Court sustains the pending objection. I strike the last question asked by [the prosecutor] and instruct the jury to disregard it completely.

[¶ 13] Mr. Simmons also claims prosecutorial misconduct occurred when the prosecutor used inadmissible character evidence during closing argument:

Now, you have to also look at the character of the Defendant and one way to do that is to, I guess, look at his past. He is a convicted felon. I'm not going to sit here and say because he's a convicted felon means he's automatically guilty of this offense because that's not the case, but it does indicate a lot about his character and what he's all about, what he's into.

Defense counsel did not object to this argument.

[¶ 14] Finally, Mr. Simmons asserts prosecutorial misconduct occurred when, during direct examination of Ms. Bradford, the prosecutor began a number of his questions by repeating the witness' response to his last question.

Q  Where have you been for the last couple of days?
A In Colorado.
Q  *In Colorado?*
A Yes.
Q  When did you get here?
A About 3:00 this morning.
Q  *3:00 this morning?*
A Yes.

(Emphasis added.) The record reflects this type of questioning—Ms. Bradford answering inaudibly and the prosecutor repeating her answer for the jury—occurred with some frequency throughout the direct examination.[1] The following excerpt further illustrates the problem:

---

1. The prosecutor's direct examination of Ms.

Bradford consists of forty-two pages in the trial

Q.... Was James home the day before on Wednesday, March 8th?

A For a while he was.

Q *For a while.* What time of the day was he home?

A A little before noon maybe.

Q *Before noon?*

A And then he left. He was in and out pretty much.

Q *He was in and out* throughout the day on Wednesday?

A Right.

Q Okay. Now, did anything unusual happen that day?

A Yes.

Q What happened that was unusual?

A We were fighting and James was arguing throughout the day.

Q *You and James were fighting and arguing throughout the day.* What was— what were you arguing about, fighting about?

A I had told him that I was leaving with my kids.

Q Speak up.

A I told him that I was leaving and taking the kids.

Q *You told him that you were leaving—*

[DEFENSE COUNSEL]: Your Honor, counsel keeps repeating the answer.

THE COURT: I'll sustain. You have been repeating questions from the outset.

JUROR: We can't hear, Your Honor. If he doesn't repeat it, we wouldn't be able to understand. We can't hear her so when he says what she says it helps.

THE COURT: Yeah. It's an improper questioning, though. I'll stand by my ruling. The witness needs to speak up.

(Emphasis added.) Despite the trial court's ruling, the prosecutor continued to repeat the witness' answers for the jury on a recurring basis. Defense counsel reiterated her objection. After the lunch recess, the trial

transcript. Of those forty-two pages, sixteen (or more than one-third) contain this type of ques-

court offered the following remarks in open court:

[T]he jury has advised the bailiff that they are having a difficult time hearing Ms. Bradford and I think I've spoken out on that a couple times. I would ask that you speak directly into the microphone, that you speak up.

To the extent the jury cannot hear testimony they obviously can't consider that. There's only so much the Court can do and I leave it up to counsel to emphasize upon the witness the need to speak up and to present testimony that the jury can, in fact, hear and consider.

Thereafter, the frequency of repeated answers diminished.

[¶ 15] In reviewing claims of prosecutorial misconduct, we have said:

Prosecutorial misconduct " 'has always been condemned in this state.' " *Earll v. State*, 2001 WY 66, ¶ 9, 29 P.3d 787, ¶ 9 (Wyo.2001) (quoting *Valerio v. State*, 527 P.2d 154, 156 (Wyo.1974)). Whether such misconduct has been reviewed on the basis of harmless error, W.R.Cr.P. 52(a) and W.R.A.P. 9.04, or on the basis of plain error, W.R.Cr.P. 52(b) and W.R.A.P. 9.05, this Court has focused on whether such error affected the accused's "substantial rights." The accused's right to a fair trial is a substantial right. "Before we hold that an error has affected an accused's substantial right, thus requiring reversal of a conviction, we must conclude that, based on the entire record, a reasonable possibility exists that, in the absence of the error, the verdict might have been more favorable to the accused." *Earll*, ¶ 9.

*Williams v. State*, 2002 WY 136, ¶ 21, 54 P.3d 248, ¶ 21 (Wyo.2002) (some citations omitted). From our review of the record, we conclude the case against Mr. Simmons was not without difficulty. The only witness against him with firsthand knowledge of the events leading to B.S.'s injuries was Ms. Bradford. The testimony at trial was that she gave inconsistent accounts of what happened, first confirming Mr. Simmons' statement that he did

tioning.

not inflict the injuries upon B.S. and then recanting and accusing Mr. Simmons of abusing the boy. Mr. Simmons also gave inconsistent statements, first telling law enforcement and DFS officials that B.S.'s injuries resulted from falls or tantrums and later testifying Ms. Bradford inflicted the injuries.

[¶ 16] Other evidence presented at trial also raised questions about Ms. Bradford's credibility, including letters she wrote to Mr. Simmons after he was arrested and DFS records indicating B.S. was removed from her care while Mr. Simmons was incarcerated. A significant portion of her testimony on direct examination likely would have gone unheard by the jury but for the prosecutor's practice of repeating her inaudible responses. The trial court admonished the prosecutor about this mode of questioning but it continued with some regularity throughout the direct examination.

[¶ 17] While the prosecutor's manner of questioning Ms. Bradford is somewhat troubling, it is not sufficient, by itself, to warrant reversal. However, that questioning, when combined with the prosecutor's improper and repeated attempts to insert prior bad acts and Mr. Simmons' character into the jury's determination—attempts made over defense counsel's objections and the trial court's rulings prohibiting such evidence—convinces us a reasonable probability exists that Mr. Simmons' right to a fair trial was affected.

[¶ 18] Despite having provided no notice of intent to raise prior bad acts, the prosecutor asked questions not once but on three separate occasions during trial about Mr. Simmons having been on probation in Texas. The prosecutor raised the issue a second and a third time even after the trial court sustained a defense objection to such questions. Again without notice, the prosecutor raised the specter of prior bad acts by asking Ms. Bradford about other incidents where Mr. Simmons had attacked her. The trial court sustained an objection as to that question. Undaunted, the prosecutor persisted in his efforts to apprise the jury of Mr. Simmons' prior criminal record by asking about his juvenile record and whether he had been placed in the Wyoming Boys' School. This time, the trial court called counsel to the bench, sharply admonished the prosecutor, sustained the defense objection, struck the question, and instructed the jury not to consider it. Nevertheless, in closing argument, the prosecutor asked the jury to look at Mr. Simmons' character and suggested one way to do that was by looking at his past.

[¶ 19] W.R.E. 404(b) clearly prohibits evidence of prior bad acts to prove character disposed to criminal conduct. Under this subsection, evidence is inadmissible if the thrust of the evidence is only to demonstrate that the defendant has a disposition to commit crimes. *Gleason v. State*, 2002 WY 161, ¶ 17, 57 P.3d 332, ¶ 17 (Wyo.2002). No other purpose for the prosecutor's repeated references to prior bad acts appears in the record, nor was any identified by the prosecutor. We conclude, based upon the entire record, a reasonable probability exists that, absent the prosecutor's conduct, the verdict might have been more favorable to the accused. The prosecutor's conduct, therefore, affected a substantial right, requiring reversal of the conviction and remand of the case for a new trial.

[¶ 20] On remand, the state will be required to comply with *Howard v. State*, 2002 WY 40, 42 P.3d 483 (Wyo.2002), if it intends to reference prior bad acts. In *Howard*, a case decided after Mr. Simmons' 2001 trial, we held that the filing of a pretrial demand for notice of intent to introduce evidence under W.R.E. 404(b) shall be treated the same as an objection and requires the state to justify the evidence as proper under W.R.E. 404(b), relevant, and more probative than unfairly prejudicial. In reaching this result, we said:

> Not only will such a rule enhance the defendant's prospects of receiving due process and a fair trial, it will also enhance the district court's ability to reflect and rule upon a significant evidentiary issue. Rulings on uncharged misconduct evidence are too important to be made in the heat and pressure of a trial, with the jury twiddling its thumbs in the next room.

2002 WY 40, ¶ 23, 42 P.3d 483.

## B. Shackling

[¶ 21] During its case in chief, the defense informed the trial court that Mr. Sim-

mons would be its next witness. Defense counsel then asked to approach the bench, and the following discussion took place:

[DEFENSE COUNSEL]: The Defendant is in shackles. I would just as soon he not go to the witness stand in shackles. I apologize for not anticipating this beforehand, but we would ask for just a short recess so that he can make that trip and then come right back.

THE COURT: [Prosecutor]?

[PROSECUTOR]: No objection, Your Honor. I know this has happened before and sometimes we've taken the shackles off underneath the table. It's whatever the Court wants.

THE COURT: Okay. Well, my thought is if a request to free him from shackles was made earlier, I would go ahead and grant that. In the context of this case, it's already been indicated that he is in custody and while he has been in street clothes I don't think the fact that he may be subject to restrain[t]s is—would be a surprise to the jurors, so I don't want to delay these proceedings any further.

It seems like things have really bogged down and ARE going slow. So I'll deny the request, and as I said, I'll allow him to testify, but he can just walk to the witness stand as any other witness would do.

The defense then called Mr. Simmons who came forward in shackles, was sworn, and proceeded to testify.

[¶ 22] Mr. Simmons claims he was denied his constitutional right to a fair trial when the trial court required him to appear before the jury in shackles. We recently addressed this same issue in *Asch v. State*, 2003 WY 18, ¶ 62, 62 P.3d 945, ¶ 62 (Wyo. 2003), and *Urbigkit v. State*, 2003 WY 57, ¶ 16, 67 P.3d 1207, ¶ 16 (Wyo.2003), wherein we said it is an abuse of discretion for a trial court to require a defendant to be shackled or otherwise physically restrained in the courtroom during a jury trial unless: (1) the state moves for such measures, (2) the court hears the state's motion, (3) the defendant has an opportunity to contest the motion, and (4) the court states on the record compelling reasons justifying the measures. Because we reverse and remand for a new trial on the

issue of prosecutorial misconduct, we do not decide whether the trial court abused its discretion in requiring Mr. Simmons to appear before the jury in shackles. However, on remand, the procedures outlined in *Asch* must be followed. Under *Asch*, the use of restraints was clearly not appropriate where, as here, the state did not object to removing the shackles and the only reasons appearing in the record for not removing them were Mr. Simmons' failure to raise the matter earlier and the court's concern that the trial was proceeding too slowly and should not be delayed further.

## C. Spectator Calling Witness a "Liar"

[¶ 23] Mr. Simmons asserts he was denied a fair trial because a spectator called a defense witness a liar during her testimony. He claims plain error occurred because the remark was prejudicial on its face and the trial court took no steps to determine whether the jury heard the remark and to correct any unfair prejudice. While asserting there are no Wyoming cases directly on point, Mr. Simmons cites *Gallup v. State*, 559 P.2d 1024 (Wyo.1977) (per curiam), and *Miller v. State*, 904 P.2d 344 (Wyo.1995), for the proposition that the trial court must at least take steps under these circumstances to cure any unfair prejudice.

[¶ 24] The record reflects the following occurred with respect to this claim. During the state's cross-examination of Mr. Simmons' mother, defense counsel asked to approach the bench. A bench conference was held during which defense counsel informed the court that, during Ms. Simmons' testimony, he heard someone behind him say, "she's a liar." Apparently, the court reporter also overheard the remark. The trial court excused the jury and asked the woman seated behind defense counsel, who was later identified as Ms. Bradford's grandmother, to come forward. The trial court admonished the woman and her husband against making statements intended to influence the jury or detract from the proceedings and threatened to oust them from the courtroom if they made further such statements. The couple apparently left the courtroom. After a recess, the jury was brought back in, and the

trial continued. The trial court did not inquire of the jury whether it heard the remark, nor did it take other corrective action. Defense counsel, however, did not object to the manner in which the trial court handled the situation. He did not, for example, ask the trial court to question the jurors about whether they heard the remark, nor did he ask for an instruction reminding the jury that it was to consider only the evidence presented. Defense counsel also did not move for a mistrial.

[¶ 25] Because no objection was made, Mr. Simmons must show plain error occurred. Under our plain error standard of review, Mr. Simmons must show a clear and unequivocal rule of law was violated, the violation clearly appeared in the record, and the violation resulted in denial of a substantial right to his material prejudice. *Urbigkit,* 2003 WY 57, ¶ 51, 67 P.3d 1207. Pursuant to the United States and Wyoming Constitutions, there is no question that a criminal defendant is guaranteed a right to a jury trial, and impartiality of the jury is an essential element of the guarantee. *Oldman v. State,* 998 P.2d 957, 963 (Wyo.2000); *Garcia v. State,* 777 P.2d 603, 607–08 (Wyo.1989). When jurors consider extrinsic evidence, a new trial is required if the evidence poses a reasonable possibility of prejudice to the defendant. *Garcia,* 777 P.2d at 608. However, a new trial is not required every time a juror is placed in a potentially compromising situation. *Id.*

> "[I]t is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote. Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen."

*Id.* at 609 (quoting *Smith v. Phillips,* 455 U.S. 209, 217, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982)). Thus, we have said the trial judge is responsible for maintaining the decorum in the courtroom and has a large measure of discretion in responding to potentially prejudicial occurrences. *Gallup,* 559 P.2d at 1026. This is so because the trial judge is in a far

better position to assess the effect of potentially prejudicial occurrences upon the jury. *Id.*

[¶ 26] At the same time, defense counsel also bears a burden to ensure such potential prejudice is adequately addressed. Where counsel has failed to ask the trial court to admonish the jury, move for a mistrial, or raise an objection to the trial court's response, we have declined to reverse. *See Clegg v. State,* 655 P.2d 1240, 1241–42 (Wyo. 1982) (upholding trial court's response when victim called the defendant a goddamn liar during his testimony); *Tryon v. State,* 567 P.2d 290, 293–94 (Wyo.1977) (upholding trial court's response to report that juror received anonymous telephone call concerning prior acts of defendant where defense counsel did not move for mistrial or object); *Gallup,* 559 P.2d at 1026 (upholding trial court's response to courtroom altercation between victim's father and defendant during victim's testimony where defense counsel failed to object, ask for further admonition, or move for mistrial). In such cases, we inferred defense counsel considered the trial court's response sufficient. *Gallup,* 559 P.2d at 1026; *Tryon,* 567 P.2d at 293. These cases illustrate the point that defense counsel bears a substantial burden to ensure such error is adequately addressed at the time it occurs. Where, as here, defense counsel stood silent while the proceedings were allowed to continue without asking the trial court to admonish the jury, give a corrective instruction, or even inquire of the jury whether it heard any comment from the audience, we hold that no violation of a clear and unequivocal rule of law occurred.

[¶ 27] Mr. Simmons has also failed to show he was denied a substantial right resulting in material prejudice. Error is prejudicial only if the defendant can establish a reasonable probability that, in the absence of the error, the verdict might have been more favorable. *Beaugureau v. State,* 2002 WY 160, ¶ 16, 56 P.3d 626, ¶ 16 (Wyo.2002). Absent evidence that the jury heard the remark made by the spectator, Mr. Simmons cannot establish a reasonable probability that, in the absence of the remark, the ver-

dict might have been more favorable, and his claim must fail.[2]

## D. Sufficiency of the Evidence

[¶ 28] We review sufficiency of the evidence claims in criminal cases according to the following standard:

[W] e must determine whether a rational trier of fact could find the essential elements of the crime were proven beyond a reasonable doubt. We do not consider conflicting evidence presented by the unsuccessful party, and afford every favorable inference which may be reasonably and fairly drawn from the successful party's evidence. We have consistently held that it is the jury's responsibility to resolve conflicts in the evidence. "We will not substitute our judgment for that of the jury, ... our only duty is to determine whether a quorum of reasonable and rational individuals would, or even could, have come to the same result as the jury actually did." [*Bloomquist v. State*, 914 P.2d 812, 824 (Wyo.1996)].

*Williams v. State*, 986 P.2d 855, 857 (Wyo. 1999) (some citations omitted); *see also Urbigkit*, 2003 WY 57, ¶ 44, 67 P.3d 1207.

[¶ 29] Pointing to Instruction No. 8, which sets forth the elements necessary for the crime of child abuse, Mr. Simmons contends sufficient evidence was not presented for the jury to convict him of both intentionally **and** recklessly inflicting bodily injury upon B.S. and, without sufficient evidence of both, the verdict must be set aside. Instruction No. 8 stated in relevant part:

The elements of the crime of Child Abuse, as charged in Count I, are:

1. On or between March 28, 2001 and March 29, 2001

2. In the County of Natrona and State of Wyoming

3. The Defendant, James Simmons, Jr.

4. As a person responsible for the child's welfare

5. Intentionally *or* recklessly

6. Inflicted physical injury, excluding reasonable corporal punishment

7. Upon [B.S.], a person under the age of eighteen (18) years.

(Emphasis added.) Mr. Simmons cites *Bush v. State*, 908 P.2d 963, 966 (Wyo.1995), in support of his argument, wherein we held a verdict must be set aside in cases where the verdict is supportable on one ground but not on another and it is impossible to tell which ground the jury selected. *Bush* and the line of cases following it involved charging documents and jury instructions containing alternative elements constituting the crime. *See Urbigkit*, 2003 WY 57, 67 P.3d 1207; *May v. State*, 2003 WY 14, 62 P.3d 574 (Wyo.2003); *Tanner v. State*, 2002 WY 170, 57 P.3d 1242 (Wyo.2002). Because in those cases the evidence was insufficient to prove both of the alternative elements and it was impossible to tell which alternative the jury relied upon for conviction, we reversed. Relying on these cases, Mr. Simmons claims his conviction for child abuse must be reversed because the state proved only that he intentionally injured B.S. and not that he recklessly injured him. Mr. Simmons asserts there is no evidence to sustain a conviction based on recklessly inflicting injury and so, under the *Bush* line of cases, his conviction must be reversed.

[¶ 30] In *O'Brien v. State*, 2002 WY 63, ¶ 20, 45 P.3d 225, ¶ 20 (Wyo.2002) (citation omitted), we said:

The Model Penal Code provides that when recklessness suffices to establish an element, such element also is established if a person acts purposely or knowingly. The Explanatory Note to this Code explains that this rule makes it unnecessary to state in the definition of an offense that the defendant can be convicted if it is proved that he was *more* culpable than the definition of the offense requires. Thus, if the crime can be committed recklessly, it is

---

2. Prior to oral arguments, Mr. Simmons filed a motion asking this Court to remand the case to the trial court for a hearing to establish that the layout of the courtroom was such that jurors could have overheard the spectator's remark.

We denied the motion because, even if Mr. Simmons established the layout of the courtroom, that would not show whether jurors in fact heard the spectator's remark.

no less committed if the actor acted purposely.

Under this reasoning, if the evidence supports a finding that a reasonable jury could conclude Mr. Simmons intentionally inflicted physical injury upon B.S., recklessness is established. We hold, therefore, it was not error for the trial court to instruct the jury that it could find Mr. Simmons guilty of child abuse if it found he intentionally or recklessly inflicted the injuries.

## CONCLUSION

[¶ 31] Even though no error occurred on the claims of insufficiency of the evidence and denial of a fair trial because of a spectator's remarks, we reverse and remand because prosecutorial misconduct occurred when the prosecutor repeatedly referred to prior bad acts over defense counsel's objections and the trial court's rulings. On remand for a new trial, the state must justify the evidence of prior bad acts as proper under W.R.E. 404(b), relevant, and more probative than prejudicial. Additionally, on remand, the trial court must ensure compliance with the procedures outlined in *Asch* if the use of physical restraints is at issue.