2005 WY 85

**Zachary Dwight Fiske JENSEN,
Appellant (Defendant),**

v.

**The STATE of Wyoming,
Appellee (Plaintiff).**

No. 04–81.

Supreme Court of Wyoming.

Aug. 4, 2005.

Representing Appellant: Kenneth M. Koski, State Public Defender; Donna D. Domonkos, Appellate Counsel; and Tina N. Kerin, Senior Assistant Appellate Counsel. Argument by Ms. Kerin.

Representing Appellee: Patrick J. Crank, Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; and James Michael Causey, Assistant Attorney General. Argument by Mr. Causey.

Before HILL, C.J., and GOLDEN, KITE, VOIGT and BURKE, JJ.

HILL, Chief Justice.

[¶ 1] Zachary Jensen (Jensen) appeals two convictions for aggravated assault arising out of an incident in which he threatened to kill his live-in girlfriend and their young son with a knife. Jensen argues for reversal of those convictions on three substantive grounds: That he was denied his Sixth Amendment right to confront a witness against him; that improper victim impact testimony was admitted; and that the prosecutor committed misconduct while cross-examining Jensen by repeatedly asking him if other witnesses were lying. We find no merit in the first two claims of error but, after reviewing the record, we agree that the prosecutor improperly questioned Jensen. However, we conclude that the error was harmless and affirm Jensen's convictions.

## ISSUES

[¶ 2] Jensen presents four issues for review:

I. Did the trial court err in limiting defense counsel's cross-examination of alleged victim Kate Spears, and, subsequently, in denying its sua sponte motion for [a] new trial?

II. Was improper victim impact testimony admitted into evidence?

III. Did prosecutorial misconduct occur when the prosecutor questioned appellant about whether other witnesses were "lying?"

IV. Does cumulative error warrant reversal of appellant's convictions?

The State's statement of the issues substantially parallels those set forth by Jensen.

## FACTS

[¶ 3] Jensen lived in an apartment in Gillette, Wyoming, with his long-term girlfriend, Kate Spears (Spears) and their young son, S.O. On the night of July 20, 2003, Jensen and Spears got into an argument over Jensen's intoxication while he was supposed to be watching the child. The dispute quickly degenerated into a physical confrontation

when Jensen refused to let Spears exit the apartment bathroom. Trying to get past Jensen, Spears attempted to knee him in the groin. Shrugging off the blow, Jensen picked Spears up and threw her against the sink. He then grabbed Spears by her neck and threw her onto the floor. Spears suffered fingernail gouges on her neck and lacerations on her back where she had hit the sink.

[¶ 4] Jensen left the bathroom and proceeded to the kitchen where he obtained a knife. Positioning himself between Spears and the apartment door, Jensen threatened to kill Spears, his son, and himself. At one point, Jensen placed the tip of the knife against his chest and attempted to stab himself. Spears was able to convince Jensen to sit down and talk. Eventually he set the knife down on a table. Spears grabbed the knife and threw it out onto the apartment balcony. Jensen responded that there were more knives where that one came from and proceeded to head to the kitchen. Spears ran out to the balcony, hid the knife behind some furniture, and began screaming for help. After a few minutes, Spears noticed that she could no longer observe Jensen in the kitchen or the apartment. Grabbing her son, Spears ran out of the apartment, got into her vehicle, and drove to a nearby convenience store where she called 911.

[¶ 5] Meanwhile, a neighbor who heard Spears' cries for help called 911. The police quickly responded, and an officer was diverted to the convenience store when Spears' call came in. The officer arrived to find Spears and her son in a distraught state. In the course of Spears' explanation of the events, unprompted, her son exclaimed that Jensen had tried to hurt him and also tried to cut himself. Jensen was eventually located in a neighboring apartment and arrested.

[¶ 6] Jensen was charged with two counts of aggravated assault and battery for threatening to use a drawn deadly weapon on Spears and his son in violation of Wyo. Stat. Ann. § 6–2–502(a)(iii) and (b)[1] (LexisNexis

---

1. Wyo. Stat. Ann. § 6–2–502(a)(iii) and (b) provides:

(a) A person is guilty of aggravated assault and battery if he:

....

2005). At trial, the State's witnesses testified as previously set forth. Jensen testified on his own behalf. He claimed that he had pushed Spears, not thrown her, onto the sink in self-defense, and he denied throwing her to the floor. Jensen also admitted that he got a knife from the kitchen. However, he insisted that he did not threaten Spears or his son; he only threatened suicide. The jury returned a verdict of guilty on both counts. Additional facts will be set forth in our discussion of the specific allegations of error presented by Jensen.

## DISCUSSION

### *Whether Jensen was Denied His Sixth Amendment Right to Confront a Witness Against Him*

[¶ 7] In June of 2001, Jensen and Spears consented to a guardianship of S.O. with Sheri Gengozian, Jensen's mother. Gengozian was the primary caretaker of S.O. until January of 2003, when she returned physical custody to Spears.[2] After Jensen was charged in this case, Spears and Gengozian continued to maintain a relationship concerning S.O. On August 29, 2003, Spears and Gengozian had a falling out. As a result, Gengozian, with guardianship papers in hand, appeared at Spears' apartment with law enforcement to take custody of S.O. On October 6, 2003, Spears filed a petition with the district court for custody of S.O. and to terminate Gengozian's guardianship. During this period, Gengozian allowed Spears to have custody of S.O. at various times, finally returning him to Spears on a permanent basis sometime around November 3, 2003. By court order, Spears was awarded temporary custody on November 6.

[¶ 8] Spears' petition to terminate Gengozian's guardianship was pending when the charges against Jensen proceeded to trial. On the first day of trial, Jensen sought to question Spears in cross-examination regarding her petition. The State objected on rele-

vancy grounds. The district court concurred and prohibited Jensen's line of questioning.

[¶ 9] On the day before Jensen was to be sentenced, this Court issued a decision in *Hannon v. State*, 2004 WY 8, 84 P.3d 320 (Wyo.2004) wherein a conviction was reversed because the trial court denied the defendant his Sixth Amendment right to confront a witness against him by restricting his ability to cross-examine the State's material witness regarding a possible motive to lie in his testimony. On its own motion, the district court scheduled a hearing to determine if a new trial was appropriate given the *Hannon* decision and the court's trial ruling prohibiting Jensen from inquiring into the petition to terminate Gengozian's guardianship. At the hearing, the State presented argument and the testimony of Spears while Jensen did likewise along with testimony from Gengozian. The district court concluded that Jensen was not entitled to a new trial because the limitations imposed on Jensen's cross-examination of Spears were proper on relevancy grounds.

[¶ 10] On appeal, Jensen maintains that the court's limitation was improper under our decision in *Hannon*. He contends that the evidence relating to Spears' petition was relevant to her motives. He argues that the only direct evidence of the alleged assaults was Spears' testimony and, therefore, the jury should have been allowed to judge Spears' possible motives in light of the fact that their child was the subject of a custody dispute with Jensen's mother.

[¶ 11] Hannon was convicted of two counts each of second- and third-degree sexual assault and one count of attempted third-degree sexual assault. *Hannon*, ¶¶ 4 and 10. On appeal, he challenged an order of the trial court that prohibited him from cross-examining the minor victim about the fact that he did not report the alleged sexual assaults by Hannon until three months after the alleged incident, when the victim was brought in for

(iii) Threatens to use a drawn deadly weapon on another unless reasonably necessary in defense of his person, property or abode or to prevent serious bodily injury to another[.]

. . . .

(b) Aggravated assault and battery is a felony punishable by imprisonment for not more than ten (10) years.

2. Pursuant to a Washington state court order in 2000, Spears had sole legal custody of S.O.

questioning about his own alleged sexual improprieties with another boy. *Id.* at ¶ 14. Hannon argued that he had a right grounded in the Sixth Amendment to the United States Constitution to cross-examine the victim concerning the allegations against him in order to show that he had a motivation to lie about the alleged assault by Hannon in order to shift blame from his own conduct. *Id.* We agreed with Hannon. We cited *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974) for the proposition that:

> Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested. Subject always to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation, the cross-examiner is not only permitted to delve into the witness' story to test the witness' perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, i.e., discredit, the witness. * * * A more particular attack on the witness' credibility is [a]ffected by means of cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand. The partiality of a witness is subject to exploration at trial, and is "always relevant as discrediting the witness and affecting the weight of his testimony." 3A J. Wigmore, Evidence § 940, p. 775 (Chadbourn rev. 1970). We have recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination. *Greene v. McElroy,* 360 U.S. 474, 496, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959).

*Hannon,* ¶ 16 (quoting *Davis,* 415 U.S. at 317–18, 94 S.Ct. 1105). A consequence of *Davis* is that "a criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby 'to expose to the jury the facts from which jurors ... could appropriately draw inferences relating to the reliability of the witness.'" *Hannon,* ¶ 18 (quoting *Delaware v.*

*Van Arsdall,* 475 U.S. 673, 680, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986)). Under the circumstances of the case, we concluded that Hannon was deprived of his Sixth Amendment right of confrontation when he was denied the opportunity to fully explore the victim's credibility through an inquiry into his potential motivations for making the accusations against Hannon since "the prohibited cross-examination was sufficiently probative of a possible ulterior motive to warrant allowing it." *Hannon,* ¶ 24.

[¶ 12] A defendant's right to cross-examine a witness, however, is not unfettered. The right is subject to the trial court's "discretion to reasonably limit cross-examination to prevent, among other things, questioning that is repetitive or of marginal relevance." *Hannon,* ¶ 22 (quoting *United States v. DeSoto,* 950 F.2d 626, 629–30 (10th Cir.1991)); *see also Olden v. Kentucky,* 488 U.S. 227, 232, 109 S.Ct. 480, 102 L.Ed.2d 513 (1988). While questions directed at revealing witness bias are an appropriate and admissible basis of impeachment, the questions asked during cross-examination must be relevant in terms of showing the witness' possible bias against the defendant. *DeSoto,* at *Id.*

[¶ 13] Here, Jensen claims that the inquiry into the guardianship proceedings would have shown that Spears had a possible ulterior motive for fabricating charges against him. We fail to perceive the relevance of Jensen's line of inquiry. While the events leading to the guardianship proceedings occurred before trial, they took place after the events that formed the basis for the charges against Jensen. If Spears' testimony at trial had been inconsistent with the statements she gave to the police, then an inquiry into the guardianship proceedings may have been probative of Spears' motivations. However, the record shows that Spears' testimony at trial was entirely consistent with the statements she made to the police the night of the incident. Jensen made no effort, at the trial court or on appeal, to demonstrate how, given that timeline, the guardianship proceedings could have had any relation to Spears' trial testimony. As the proponent, it was Jensen's burden to demonstrate relevance,

and he failed to do so. Unlike the case in *Hannon,* here we cannot conclude that the prohibited cross-examination was sufficiently probative of a possible ulterior motive to warrant allowing it. Therefore, we must conclude that the district court did not abuse its discretion.

### Whether Improper Victim Impact Testimony Was Admitted

[¶ 14] Jensen contends that irrelevant victim impact testimony and argument occurred throughout the trial, tainting the proceedings against him. In his opening statement, the prosecutor described S.O. as a "very frantic frightened 4–year–old boy" who was crying and screaming when the police arrived in response to Spears' 911 call. Then, in her testimony,[3] Spears recounted her emotional state, as well as S.O.'s:

> A: He started yanking on [S.O.'s] arm and telling me that he wasn't going anywhere, and that he wasn't letting us leave, and he is just completely irrational. I was scared.
>
> Q: Okay. You were scared, you say?
>
> A: Uh-huh.
>
> Q: Okay. What was [S.O.] doing while this took place?
>
> A: Crying, screaming.
>
> Q: Okay. Was [S.O.] saying anything?
>
> . . . .
>
> A: He didn't say much but, no, Mommy, Daddy.
>
> Q: Say that again, please. I didn't hear.
>
> A: I remember him saying no. I remember him saying, Mommy, Daddy. I don't remember him saying anything else. I remember him crying a lot.
>
> . . . .
>
> Q: Okay. And what kind of a motion did he make?
>
> A: A stabbing motion towards us.
>
> Q: Could you pick up the knife and demonstrate the motion he made, please?
>
> A: (Indicating.)
>
> Q: Okay. How did you feel then, Kate?

> A: I was terrified. I thought—I thought I was going to die. I thought my son was going to die.
>
> . . . .
>
> Q: Yes. Was [S.O.] exhibiting any signs of fear or emotion when you were on the deck?
>
> A: Yeah, he was crying.
>
> Q: Okay. When did he first start crying?
>
> A: In the bathroom.
>
> Q: Okay. When did he stop?
>
> A: When I took him to the grandmother's.

The investigating officer described Spears as "shaking," "visibly upset," and crying, with S.O. in her arms "clinging on to her" neck. The officer noted that the demeanor of Spears and S.O. improved once officers were on the scene. During closing argument, the prosecutor commented:

> As [police officer Hannigan] approached [Spears], he notices she's crying. She's clinging to her child. Her child has his arms around her neck grasping back. The child is crying. Mother is crying.
>
> Officer Hanningan asks, What's going on?
>
> Mother says, I've just escaped from my apartment.
>
> Child says, My dad tried to hurt me and then he cut himself.

Jensen argues that the elements of the charged crimes had nothing to do with the emotional state of Spears or S.O., and this testimony was used to stir up sympathy for them, depriving him of his right to a fair trial.

[¶ 15] There was no objection, so Jensen must demonstrate plain error:

> The plain error doctrine requires us to make this series of findings: (1) The record must clearly present the incident, (2) appellant must demonstrate that a clear and unequivocal rule of law was violated in a clear and obvious, not merely arguable, way, and (3) that appellant was denied a

---

3. We have included parts of Spears' testimony not cited specifically by Jensen as error in order to provide context.

substantial right resulting in material prejudice to him.

*Person v. State,* 2004 WY 149, ¶ 32, 100 P.3d 1270, ¶ 32 (Wyo.2004) (citing *Schmidt v. State,* 2001 WY 73, ¶ 24, 29 P.3d 76, ¶ 24 (Wyo.2001)).

[¶ 16] We apply the following principles when analyzing the admissibility of victim impact evidence:

The evidence must be relevant to be admissible. W.R.E. 402. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." W.R.E. 401. In criminal cases, "[e]vidence is always relevant if it tends to prove or disprove one of the elements of the crime charged." *Gomez v. State,* 2003 WY 58, ¶ 6, 68 P.3d 1177, ¶ 6 (Wyo.2003) (quoting *Geiger v. State,* 859 P.2d 665, 667 (Wyo.1993)). Relevant evidence may be excluded, however, if "its probative value is substantially outweighed by the danger of unfair prejudice." W.R.E. 403.

*Moore v. State,* 2003 WY 153, ¶ 26, 80 P.3d 191, ¶ 26 (Wyo.2003). The testimony of victims of a crime describing how it affected their lives after the crime is irrelevant with respect to issues before a jury. *Moore,* ¶ 27 (citing *Justice v. State,* 775 P.2d 1002, 1010–11 (Wyo.1989)).

[¶ 17] In this case, the testimony of Spears and the investigating officer was clearly relevant. Jensen was charged with a count of aggravated assault against Spears and S.O. respectively. The jury was instructed on the elements of aggravated assault.[4]

1. On or about July 20, 2003;
2. In Campbell County, Wyoming;
3. The Defendant, Zachary Dwight Fiske Jensen;
4. Threatened to use a drawn deadly weapon
5. on [Kate Spears and S.O.];
6. When not reasonably necessary in defense of the Defendant's person, property or abode to prevent serious bodily injury to another.

We have held that the statutory phrase "threatens to use" that is embodied in element four of the instructions to the jury requires "proof of an actual threat of physical injury during the act of employing a deadly weapon." *Miller v. State,* 2003 WY 55, ¶ 24, 67 P.3d 1191, ¶ 24 (Wyo.2003); *see also Lowseth v. State,* 875 P.2d 725, 729 (Wyo.1994) and *Johnston v. State,* 747 P.2d 1132, 1134–35 (Wyo.1987). Spears' testimony that she was scared and terrified for her life and that of her son while Jensen was making stabbing motions with the knife goes towards proving that they were threatened by his actions. Furthermore, Jensen's theory of the case was that Spears was lying about the confrontation and that he had never threatened Spears or S.O., only himself. The testimony regarding the emotional state of Spears and S.O. during and in the immediate aftermath of the assault tends to disprove the assertion that Spears' accusations were calculated. The testimony did not tend to establish the impact of this crime on Spears' or S.O.'s lives because it was restricted to their emotional states and reactions at the time of the assault and in the immediate aftermath when the police contacted Spears at the convenience store in response to her 911 call minutes later. Jensen cannot make the final two showings—that there was a violation of a clear and unequivocal rule of law, and that he was denied a substantial right materially prejudicing him—required to demonstrate plain error. The testimony was relevant and admissible, and no error occurred in its admission.

### Whether There Was Prosecutorial Misconduct

[¶ 18] Jensen claims that the prosecutor engaged in improper cross-examination when he repeatedly asked Jensen if Spears or an investigating officer were lying in their testimony. The first instance of such questioning occurred when Jensen expressed disagreement with certain facts in the investigating officer's report:

---

4. There were two instructions, one for each victim.

Q: And did Officer Hannigan talk to you about blocking [Spears] in the bathroom?

A: Officer Hannigan asked me what happened that night. I explained up to the bathroom, and when he—it started—asking about blocking and all of that other stuff, the conversation on my part ended.

Q: Did you tell Officer Spears [sic]—or Officer Hannigan—I'm sorry—that you did block Spears' way out of the bathroom because she did not wish—because you did not wish her to leave?

A: No.

Q: So if Officer—if Officer Hannigan put that in his report, then he's not telling the truth?

A: There's [sic] a few things that Officer Hannigan put in there that did not even come out of my mouth. I actually talked to the officer that booked me in last night, and she couldn't remember anything about that.

Q: Officer Hannigan lied about several things?

A: I'm pretty sure Officer Hannigan put a few things that weren't valid in that.

Q: How are you sure about this?

A: Because I remember that night. I may have blown a .81[sic], but when something that crucial happens in my life, it's almost like every detail is right on the back of my head. I can remember that night picture perfect.

Q: Okay. So it was Officer Hannigan was wrong then, or he lied then when he wrote this police report out?

A: He was wrong. I ended it at the bathroom, yes.

The cross-examination of Jensen continued in a similar vein as the prosecutor repeatedly asked him whether Spears or Officer Hannigan were "lying," "not telling the truth," "making it up," or "untruthful" in those aspects of their testimony that conflicted with Jensen's. In his closing argument, the prosecutor continued by saying, "In fact, Mr. Jensen says it's all a lie . . . ." and "[Jensen] claims that he's here today because Ms. Spears is lying, making this up to get him. And Officer Hannigan is lying and made up all the testimony that you heard today."

Jensen argues that resolution of this case hinged on the credibility, or lack thereof, of the witnesses, and that since he and Spears were the only witnesses to the charged crimes, prejudice resulted from the prosecutor's use of this cross-examination tactic because it put the jury in the position of having to call Spears and a police officer liars.

[¶ 19] We have said in the context of closing argument that it is not reversible error for a prosecutor to argue that a defendant is a liar when "the evidence supports a reasonable inference that such is in fact the case." *Beaugureau v. State,* 2002 WY 160, ¶ 14, 56 P.3d 626, ¶ 14 (Wyo.2002) (citing *Barnes v. State,* 642 P.2d 1263, 1266 (Wyo. 1982)). In this case, there existed "express contradictory testimony" rendering a reasonable inference that at least one of the witnesses was lying. *Beaugureau,* ¶ 14; *Wheeler v. State,* 691 P.2d 599, 604–5 (Wyo.1984). The prosecutor was presenting an argument to the jury based upon reasonable inferences drawn from the evidence. Furthermore, while making this argument, the prosecutor made it clear to the jury that the decision rested with them when he quoted the jury instructions that stated, ". . . if an attorney hints by a question that certain things are or are not true, you should disregard the hint. A question is not evidence, and it should be considered only to the extent that it supplies meaning to the answer." We find no error in the prosecutor's statements in closing argument.

[¶ 20] Turning to the prosecutor's cross-examination of Jensen, we note, generally, that a defendant who testifies in a criminal case may be cross-examined regarding his credibility just like any other witness. *Gist v. State,* 766 P.2d 1149, 1152–53 (Wyo. 1988); *MacLaird v. State,* 718 P.2d 41, 47 (Wyo.1986); *Porter v. State,* 440 P.2d 249, 250 (Wyo.1968). In *Beaugureau,* however, we observed that there was a limit to the cross-examination of a criminal defendant:

Nonetheless, it is likewise error and misconduct for the prosecutor to cross-examine a defendant using the "lying" or "mistaken" technique (*i.e.,* well, then if "so-and-so" said "such-and-such," was he "mistaken" or "lying?"). Such questions are im-

proper. If the prosecutor merely asked Beaugureau about what other witnesses had to say, allowing the jury to draw its own conclusions, the cross-examination would not have been objectionable. *State v. Diggs,* 272 Kan. 349, 34 P.3d 63, 72–73 (2001); *State v. Manning,* 270 Kan. 674, 19 P.3d 84, 100–3 (2001) ("Questions which compel a defendant or witness to comment on the credibility of another witness are improper. It is the province of the jury to weigh the credibility of the witnesses." (collecting cases)); *State v. Stevenson,* 70 Conn.App. 29, 797 A.2d 1, 7–9 (2002) (Such questions are improper because they "require a defendant to comment on another witness' veracity ... invade the province of the jury, create the risk that the jury may conclude that, in order to acquit the defendant, it must find that the other witnesses lied, and distort the state's burden of proof.") (relying on *State v. Singh,* 259 Conn. 693, 793 A.2d 226, 234–39 (2002)) (collecting cases); *also see State v. Walden,* 69 Wash.App. 183, 847 P.2d 956, 959 (1993); and *State v. Pitts,* No. 47488–0–I, 2001 WL 1641225 at *4 (Wash.App. Div. 1, Dec.24, 2001) (per curiam) (use of word "lying" is misconduct; use of word "mistaken" merely objectionable).

*Beaugureau,* ¶ 17. The reasoning for prohibiting this type of questioning was succinctly summarized by the Iowa Supreme Court:

[A] defendant who is asked whether another person lied is commenting directly on the other person's credibility.

The issue then is whether any purpose is served in asking a defendant whether another witness is lying. We think the predominate, if not sole, purpose of such questioning is simply to make the defendant look bad, as implied by the Maryland court's observation in [*Fisher v. State,* 128 Md.App. 79, 736 A.2d 1125, 1163 (1999)] that the accused's answer is unimportant. * * * The accused's answer is unimportant because the accused is in a no-win situation. If the defendant says the other witness *is* lying, then the defendant is put in the position of calling someone a liar, a particularly unenviable state when the other witness is a law enforcement officer. See [*State v. Emmett,* 839 P.2d 781, 787 (Utah 1992)] (holding such questions are improper because they put "the defendant in the untenable position of commenting on the character and motivations of another witness who may appear sympathetic to the jury"). If the defendant says a contradictory witness is *not* lying, then a fair inference is that the *defendant* is lying.

But, as any trial lawyer knows, there may be many explanations for differing descriptions of the same event. People have different perceptions of the same conversation that affect how and what they remember. Perhaps there was a misunderstanding of what was said; perhaps one person was distracted and did not fully or correctly hear the words uttered by the other person. People sometimes hear what they want to hear. It is unjust to make the defendant give an opinion as to who is lying when, in fact, it is possible that neither witness has deliberately misrepresented the truth. It is also unreasonable to expect the defendant to sift through the variables of human communication to offer an alternative explanation for contradictions in witnesses' testimony.

We also think the use of this tactic—asking the defendant whether another witness is lying—is incompatible with the duties of a prosecutor. Unfairly questioning the defendant simply to make the defendant look bad in front of the jury regardless of the answer given is not consistent with the prosecutor's primary obligation to seek justice, not simply a conviction. Nor is such questioning consistent with the prosecutor's duty to the defendant to ensure a fair trial, including a verdict that rests on the evidence and not on passion or prejudice. [*State v. Casteneda–Perez,* 61 Wash.App. 354, 810 P.2d 74, 79 (Wash.Ct.App.1991)] (holding prosecutor's questions asking witnesses whether other witnesses were lying was "contrary to the duty of prosecutors, which is to seek convictions based only on probative evidence and sound reason").

*State v. Graves,* 668 N.W.2d 860, 872–73 (Iowa 2003) (emphasis in original) (footnotes omitted).

[¶ 21] The State attempts to excuse the prosecutor's form of cross-examination by claiming that it was Jensen who initiated the attack on the veracity of Spears and Officer Hannigan. The State argues that the prosecutor was merely attempting to clarify unexpected answers given by Jensen in response to questions exploring the contradictions between his testimony and that offered by Spears and the officer. The State characterizes the prosecutor's questions as not particularly artful but innocuous.

■ [¶ 22] After reviewing the record, we cannot agree with the State's characterization. A review of the excerpt of Jensen's cross-examination quoted above shows that after Jensen disputed parts of the investigating officer's report, the prosecutor asked whether the officer was "not telling the truth" and then followed that up with multiple instances of questions that specifically asked whether the officer or Spears was "lying." This is precisely the type of questioning that we found improper in *Beaugureau.* We stress again here that it is error and misconduct for the prosecutor to cross-examine a defendant using the "lying" or "not telling the truth" or "mistaken" technique. *Beaugureau,* ¶ 17; *see also Taylor v. State,* 2001 WY 13, ¶ 21, 17 P.3d 715, ¶ 21 (Wyo.2001). Even if Jensen had been the party that initially ventured into this territory by calling Officer Hannigan or Spears a liar, the prosecutor still has the duty to refrain from this type of questioning. Returning to the Iowa decision cited above, we agree with the conclusion of that court that a defendant cannot "open the door" to the prosecution's use of this tactic.[5]

For the reasons discussed, we find more persuasive the rationale of those courts that have held it is improper to ask the defendant whether another witness has lied. We also decline to recognize an exception to this rule as a handful of courts have done. The underlying rationale of those courts recognizing an exception is that the defendant has opened the door by contradicting testimony of government wit-

nesses "in circumstances that exclude the possibility that the prosecution's witnesses may have been mistaken or [may have] testified to events based on assumptions or faulty memory." [*People v. Overlee,* 236 A.D.2d 133, 666 N.Y.S.2d 572, 577 (1997); *State v. Morales,* 198 Ariz. 372, 10 P.3d 630, 633 (Ariz.Ct.App.2000); *State v. Pilot,* 595 N.W.2d 511, 518 (Minn.1999)] We think, however, that whether the defendant has invited the questioning is more properly considered in assessing the prejudice element of a due process claim.

First of all, the justification for admitting this evidence—that the defendant has opened the door—does not resolve the fundamental doubt as to the probative value of such questioning. [*State v. Flanagan,* 111 N.M. 93, 801 P.2d 675, 679 (N.M.Ct.App.1990)] ("Whether the defendant believes the other witnesses were truthful or lying is simply irrelevant."); *People v. Berrios,* 298 A.D.2d 597, 750 N.Y.S.2d 302, 302 (2002) ("Whether the defendant believed that the other witnesses were lying is irrelevant." (Citation omitted.)) Secondly, the exception depends on a difficult determination— whether alternative explanations exist for discrepancies in the witness' testimony, a decision that more properly rests with the jury. Finally, prosecutors and trial judges will have more guidance in assuring proper examination of witnesses with a bright-line rule that bars such inquiries without exception. For these reasons, we hold "were-they-lying" questions are improper under any circumstance. *See* [*State v. Singh,* 259 Conn. 693, 793 A.2d 226, 239 (Conn.2002)] (rejecting exception).

*Graves,* 668 N.W.2d at 873. The proper approach for a prosecutor is to ask the defendant "what other witnesses had to say [and allow] the jury to draw its own conclusions" and then make a proper closing argument based on the testimony. *Beaugureau,* ¶¶ 14 and 17. The prosecutor's questions were not innocuous. They were improper.

---

5. While it should probably go without saying, we emphasize that the prosecutor is, of course, not responsible when the defendant calls another witness a liar in a non-responsive answer to a proper cross-examination.

 [¶ 23] The question before us, then, is whether the prosecutor's misconduct was prejudicial. *Beaugureau,* ¶ 18. Jensen failed to object to any of the prosecutor's questions so our review is through the plain error prism.[6]

> Prosecutorial misconduct " 'has always been condemned in this state.' " *Earll v. State,* 2001 WY 66, ¶ 9, 29 P.3d 787, ¶ 9 (Wyo.2001) (quoting *Valerio v. State,* 527 P.2d 154, 156 (Wyo.1974)). Whether such misconduct has been reviewed on the basis of harmless error, W.R.Cr.P. 52(a) and W.R.A.P. 9.04, or on the basis of plain error, W.R.Cr.P. 52(b) and W.R.A.P. 9.05, this Court has focused on whether such error affected an accused's "substantial rights." The accused's right to a fair trial is a substantial right. "Before we hold that an error has affected an accused's substantial right, thus requiring reversal of a conviction, we must conclude that, based on the entire record, a reasonable possibility exists that, in the absence of the error, the verdict might have been more favorable to the accused." *Earll,* ¶ 9.

*Simmons v. State,* 2003 WY 84, ¶ 15, 72 P.3d 803, ¶ 15 (Wyo.2003) (quoting *Williams v. State,* 2002 WY 136, ¶ 21, 54 P.3d 248, ¶ 21 (Wyo.2002)).

[¶ 24] After reviewing the entire record, we cannot conclude that, in the absence of the prosecutor's misconduct, a reasonable possibility exists that the verdict would have been more favorable to Jensen. Although Jensen and Spears presented differing accounts of the events on the night in question, the circumstantial evidence presented at trial strongly corroborated Spears' testimony— most importantly, the physical injuries suffered by Spears and the spontaneous declaration by Jensen's son, S.O., that his daddy tried to hurt him. While corroborating Spears, the circumstantial evidence contradicted Jensen's testimony and it was not rebutted by him. The evidence was sufficient to sustain Jensen's convictions even taking into account the prejudicial effect of the prosecutor's cross-examination. Therefore, within the context of the case, we conclude that the prejudice to Jensen was slight.

6. *See supra* ¶ 15.

Accordingly, we conclude that the error was harmless.

### Whether There W as Cumulative Error

[¶ 25] Finally, Jensen contends that if there were multiple harmless errors, then the cumulative effect of those errors was sufficient to deny him a fair trial. Having found only one harmless error, and no other errors prejudicial or otherwise, there can be no cumulative error.

### CONCLUSION

[¶ 26] The prosecutor committed misconduct when, during cross-examination, he asked Jensen if other witnesses were lying when their testimony conflicted with his. We conclude, however, that the error was not sufficiently prejudicial to require reversal of Jensen's convictions. Finding no other error, we affirm Jensen's judgment and sentence.